**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| P&P Construction Group, LLC, et al.,[1] | § Case No. 23-90292 |
| | § |
| Debtors. | § Jointly Administered |

**DEBTORS' EMERGENCY MOTION FOR ENTRY
OF AN ORDER AUTHORIZING DEBTORS TO (I) PAY THEIR
PREPETITION INSURANCE OBLIGATIONS, (II) PAY THEIR
PREPETITION BONDING OBLIGATIONS, (III) MAINTAIN
THEIR POSTPETITION INSURANCE COVERAGE,
(IV) MAINTAIN THEIR SURETY BONDS, AND (V) MAINTAIN
POSTPETITION FINANCING OF INSURANCE PREMIUMS**

> **Emergency relief has been requested.  Relief is requested not later than April 17, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 17, 2023 at 11:00 a.m. (prevailing Central Time).  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage.  The meeting code is "JudgeLopez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance"**

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are P&P Construction Group, LLC (4071), and BRH-Garver Construction, LLC (8315).  The Debtors' address is 7600 S. Santa Fe, Building D, Houston, TX 77061.

> link on Judge Lopez's homepage.  Select the case name, complete the required fields and click "Submit" to complete the appearance.

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") respectfully state the following in support of this emergency motion (the "***Motion***"):

## I.
## RELIEF REQUESTED

1. By this Motion, the Debtors request entry of an order (the "***Order***"), substantially in the form attached hereto, authorizing the Debtors to:

   (a) continue to (i) administer insurance coverage currently in effect, as set forth below, and pay all amounts on account of prepetition premiums, premium financing payments, taxes, charges, fees, and other obligations owed under or with respect thereto (including any fees due to the Debtors' insurance broker, **Alliant Insurance Services, Inc. (**the "***Insurance Broker***" and such fees, the "***Insurance Broker Fees***")) (collectively, the "***Prepetition Insurance Obligations***"); and (ii) pay amounts on account of any obligations owed to issuers of surety bonds on the Debtors' behalf that accrued but remain unpaid as of the Petition Date (as defined below), and any fees and other obligations associated therewith (including any Indemnity Obligations (as defined herein) and any fees (such fees, the "***Surety Broker's Fees***" and, together with the Insurance Brokers' Fees, the "***Brokers' Fees***") due to Alliant Insurance Services, Inc., the Debtors' surety bond broker (in such capacity and together with its affiliates, the "***Surety Broker***" and, together with the Insurance Broker, the "***Brokers***")) (collectively, the "***Prepetition Bonding Obligations***"), to the extent the Debtors determine in their discretion that such payments are necessary or appropriate;

   (b) in the ordinary course of business, pay all postpetition premiums, administrative fees, deductibles, and other obligations (including the Brokers' Fees) relating to (i)

Page 2

    the insurance coverage and related programs, and any other additional, revised, or supplemental insurance policies or programs obtained by the Debtors (the "***Postpetition Insurance Obligations***" and, together with the Prepetition Insurance Obligations, the "***Insurance Obligations***") and (ii) the Debtors' surety bonds (including with respect to the Indemnity Obligations) (the "***Postpetition Bonding Obligations***" and, together with the Prepetition Bonding Obligations, the "***Bonding Obligations***"), as such payments become due;

 (c) revise, extend, supplement, change, terminate, and/or replace the Debtors' insurance policies or purchase new, supplemental, or replacement surety bonds, as needed in the ordinary course of business;

 (d) maintain or renew current, or enter into new, postpetition financing arrangements with respect to insurance premiums and surety indemnity agreements with respect to surety bonds; and

 (e) granting related relief.

 2. The Debtors seek authority under this Motion to make payments on account of the Insurance Obligations and the Bonding Obligations, whether prepetition or postpetition, as they come due in the ordinary course of business.

 3. Although the Debtors do not believe Court approval is required to maintain their existing Insurance Policies and Surety Bonds (each as defined herein) or to amend, extend, renew, or terminate the Insurance Policies or Surety Bonds in the ordinary course of business, or to obtain new insurance policies or surety bonds, out of an abundance of caution, the Debtors request entry of the proposed Order authorizing them to take such actions and to pay the Insurance Obligations and the Bonding Obligations where necessary to maintain the Insurance Policies and Surety Bonds.

## II.
## JURISDICTION AND VENUE

4. This Court has jurisdiction over this Motion. 28 U.S.C. §§ 157, 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief requested herein is §§ 105(a), 362(d), 363(b), 363(c), and 364(c) of title 11 of the United States Code (the "***Bankruptcy Code***"),[2] Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***").

## III.
## BACKGROUND

6. BRH-Garver Construction, LLC ("***Garver***") is a civil contractor headquartered in Houston, Texas, focused on micro-tunneling (or trenchless excavation) and related infrastructure projects to public and private projects as well as related service competencies to other areas of site/civil construction. Garver owns and operates a large fleet of equipment and has an in-house fabrication facility that manufactures tools and equipment for specialty projects.

7. The Garver Business was historically a profitable one. In 2021, for example, the audited financials of the business showed that it generated approximately $4 million in net income and more than $6 million in EBITDA on stated revenues of more than $61 million.

8. In 2022, however, the Debtors sustained significant losses on two projects, one of which was bonded by the Hartford Fire Insurance Company ("***Hartford***"). By February 2023, Hartford had issued "hold funds" letters to the counterparties under certain of the Debtors' job contracts

---

[2] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

requesting that the respective owners release no further contract balances to the Debtors without Hartford's prior written consent.

9. Shortly thereafter, the Debtors' other bonding company, Markel Insurance Company ("*Markel*," together with Hartford the "*Sureties*") issued "hold funds" letters of its own, and the Debtors' prepetition senior secured lender, Stellar Bancorp Inc. ("*Stellar*"), accelerated the Debtors' prepetition secured loans and sent letters to project owners directing them to remit any further progress payments or retainage directly to the Prepetition Lender. Shortly thereafter, the Prepetition Lender froze the Debtors' bank accounts.

10. The collective effect of these actions was to deprive the Debtors of access to any cash whatsoever except for some limited amounts that Hartford and Markel funded for the weeks of April 3 and April 10, 2023 for payroll and certain vendor payments. Unable to access any of the funds that would ordinarily be available to fund the Debtors' ordinary operating expenses, including critical items like payroll and utilities, on April 12, 2023 (the "*Petition Date*"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[3] The Debtors continue to manage and operate their businesses as a debtors-in-possession pursuant to §§ 1107 and 1108.

11. A detailed description of the Debtors' business, capital structure, and events leading to these chapter 11 cases is fully set forth in the *Declaration of Jeffrey Anapolsky* (the "*Anapolsky Declaration*") and is incorporated herein by reference.

## IV.
## BASIS FOR RELIEF

**A.     The Debtors' Insurance Policies**

12. In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by one or more third-party insurance

---

[3] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

carriers (the "***Insurance Carriers***"), which provide coverage for, among other things, directors' and officers' liability, general liability, pollution liability, business automobile liability, workers' compensation liability, excess liability, employment practices and third party liability (collectively, the "***Insurance Policies***")[4]. A detailed list of the Insurance Policies under which the Debtors are currently covered is attached hereto as Exhibit A and incorporated herein by reference.

13. The Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts. The Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry. The total amount of premiums and payments associated with the corporate Insurance Policies is approximately $884,000, and premiums and payments associated with specific project Insurance Policies is $365,000. The Debtors' directors' and officers' policy expire on January 12, 2024. The Debtors' contractor's professional and pollution liability policies expire on December 28, 2023. The Debtors' ERISA fidelity bond expires on January 1, 2026, and the specific project policies have various expiration dates. All of the Debtors' other Insurance Policies expire on August 17, 2023.

---

[4] The descriptions of the Insurance Policies set forth in this Motion constitute a summary only. The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this Motion. Although Exhibit A is intended to be comprehensive, the Debtors may have inadvertently omitted Insurance Policies from Exhibit A. The Debtors request authority to honor existing Insurance Policies and renew Insurance Policies, as applicable, regardless of whether the Debtors inadvertently failed to include a particular Insurance Policy on Exhibit A, and any such omitted Insurance Policy is hereby included in the defined term "Insurance Policies" as used herein and in the proposed Order. Moreover, and in addition to the Insurance Policies listed on Exhibit A, the Debtors maintain numerous insurance policies with respect to, among other things, workers' compensation, employee health, disability, and life insurance benefits. These programs are described in the *Debtors' Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition (I) Wages, Salaries, and other Compensation; (II) Reimbursable Employee Expenses; (III) Employee Benefits; and (IV) Related Costs* (the "***Employee Wages Motion***") filed contemporaneously herewith. Relief relating to such workers' compensation, employee health, disability, and life insurance benefits are sought in the Employee Wages Motion.

14. In an effort to manage cash flows most efficiently, the Debtors have financed the approximately $475,700 in premiums for the Debtors' excess commercial liability and equipment floater policies (the "**Financed Policies**") pursuant to a premium financing agreement (the "**PFA**") between the Debtors and First Insurance Funding (the "**Premium Financier**"). Under the PFA, the Debtors made an initial down payment of approximately $71,360 on September 29, 2022 and the remaining premium balance of approximately $404,300 (plus a $8,850 finance charge) is required to be paid in ten (10) monthly payments of $41,300. As of the Petition Date, there is approximately $124,000 outstanding under the PFA (*i.e.*, three (3) monthly payments).

15. The premiums for the directors' and officers', pollution liability, and ERISA bond policies have all been paid in full. The premiums for the other Insurance Policies (excluding the financed policies described above) are due and paid monthly with the next payment due April 15, 2023. As of the Petition Date, approximately $224,750 of premiums remain with respect to such Insurance Policies. The premiums for project specific policies are paid upon confirmation of insurance coverage. As of the Petition Date, the Debtors owe approximately $26,688 in premiums related to project specific policies.

16. Additionally, the Debtors owe a $5,000 deductible to its equipment floater insurer related to a rental equipment claim. The payment of the deductible is required by the insurer prior to releasing the claim amounts. Additional premiums may come due and owing if any project specific policies need to be extended past current expiration dates.

17. The Insurance Broker manages the Debtors' relationships with the Insurance Carriers. Among other things, the Insurance Broker assists the Debtors in selecting the appropriate carriers (subject to the Debtors' approval) and represent the Debtors in negotiations with the Insurance Carriers. The Insurance Broker has assisted the Debtors in obtaining the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and have obtained savings for the Debtors in the procurement of such policies. The Insurance Broker collects Broker Fees for services rendered in

addition to or as part of the premiums paid on the Insurance Policies. As of the Petition Date, the Debtors do not believe they owe any amounts to the Insurance Broker on account of prepetition Broker Fees. To the extent any such prepetition amounts are determined to remain outstanding, the Debtors seek authority to honor any Broker Fees in full, in cash to ensure uninterrupted coverage under their Insurance Policies.

18. Maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "***Operating Guidelines***"), the federal laws and regulations applicable to the Debtors' businesses, the state of Texas, and the Debtors' various contractual commitments. Thus, the Debtors submit that they should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies or the financing of the same under the PFA as such obligations come due in the ordinary course of the Debtors' businesses.

19. The Debtors' maintenance of their relationships with the Insurance Carriers, the Insurance Broker, and the Premium Financier is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods. Accordingly, the Debtors request authorization to pay any Prepetition Insurance Obligations to the Insurance Carriers, the Insurance Broker, or the Premium Financier, as applicable, to the extent that the Debtors determine, in their sole discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies and to maintain good relationships with the various Insurance Carriers, the Insurance Brokers, and the Premium Financier. The Debtors additionally request, out of an abundance of caution, authority to renew or replace the Insurance Policies as necessary in the ordinary course.

**B.     The Debtors' Surety Bonds**

20. In the ordinary course of business, as required by certain applicable statutes, rules, and regulations, the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies (collectively, the "*Surety Bonds*"). The Surety Bonds generally cover performance, completion, and other miscellaneous items (collectively, the "*Covered Obligations*"). A detailed list of the Surety Bonds that are currently maintained for the benefit of the Debtors is attached hereto as Exhibit B.[5] The Surety Bonds provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

21. The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment of their obligations covered by the surety bond from the beneficiary of the surety to the surety. If the Debtors fail to pay the Covered Obligations, the applicable surety will pay the Debtors' obligations, up to a specified amount. Unlike an insurance policy, if a surety incurs a loss on a surety bond, the surety is generally entitled to recover the full amount of that loss from the Debtors.

22. As of the Petition Date, the Debtors' outstanding Surety Bonds were issued by two separate Sureties: Hartford and Market. Hartford has issued 19 surety bonds totaling approximately $121,369,789, and Markel has issued 4 surety bonds totaling approximately $80,385,008.00.

23. Pursuant to its Surety Bonds with Markel, the Debtors are party to an indemnity agreement (the "*Surety Indemnity Agreement*") with Markel. Under the Markel Surety Indemnity Agreement, the Debtors have agreed to indemnify Markel from any loss, cost, or expense that the Indemnified Surety may incur on account of the issuance of Surety Bonds by Markel on behalf of the Debtors (the "*Indemnity Obligations*"). The Surety Indemnity

---

[5] The Debtors request authority to honor obligations and renew all their surety bonds, as applicable, notwithstanding any failure of the Debtors to include a particular surety bond on Exhibit B.

Agreement also permits Markel, from time to time, to request collateral as security from the Debtors in connection with the Indemnity Obligations.

24. In addition, although the predecessor to Garver was party to a Surety Indemnity Agreement between itself, certain enumerated guarantors and Hartford. The Hartford Surety Indemnity Agreement was not expressly assumed by Garver when it acquired substantially all of the assets of its predecessor in December 2021.

25. The Debtors' Surety Broker manages the Debtors' relationships with the Sureties. Among other things, the Surety Broker assists the Debtors in selecting the appropriate Sureties (subject to the Debtors' approval) and represents the Debtors in negotiations with the Sureties. The Surety Broker has assisted the Debtors in obtaining the bonding coverage necessary to operate their businesses in a reasonable and prudent manner and has obtained savings for the Debtors in the procurement of such coverage.

26. The Debtors' Surety Bond premiums are paid from the proceeds of each project's first mobilization payment. Typically, the Debtors receive the first mobilization payment from each specific project upon completion of five percent of work. As of the Petition Date, there is approximately $141,714 due in Prepetition Bonding Obligations.

27. To continue their business operations, the Debtors must be able to provide financial assurances to state governments, regulatory agencies, and other third parties. This, in turn, requires the Debtors to maintain access to their Surety Bonds, including by paying the Bonding Obligations as they come due, and maintaining required letters of credit, paying for any indemnity obligations that may arise in connection with the Surety Bonds in the ordinary course of business, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the existing Surety Bonds or any additional postpetition surety bonds.

28. The Debtors, therefore, request that they be authorized to: (i) pay any Prepetition Bonding Obligations; (ii) continue to make all

payments for postpetition Bonding Obligations; and (iii) revise, extend, supplement, or change the Surety Bonds as needed, including through the issuance of new surety bonds.

## V.
## APPLICABLE AUTHORITY

A. **Payment of the Insurance Obligations and Maintenance of the Insurance Policies Is Necessary to Comply with United States Trustee Requirements, the Bankruptcy Code, and the Bankruptcy Local Rules**

29. Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and is required under the Operating Guidelines, the federal laws and regulations applicable to the Debtors' businesses, the laws of the states in which the Debtors operate, and the Debtors' various contractual commitments. See Operating Guidelines Sec. 6 (requiring maintenance of appropriate insurance coverage).

30. In addition, under § 1112(b)(4)(C), a "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). Further, Bankruptcy Local Rule 4002-1 requires a debtor "to prevent the depletion of assets of the business during the proceedings." Bankr. L. R. 4002-1. Maintenance of the foregoing coverage and payment of the Insurance Obligations is necessary to comply with this Bankruptcy Local Rule, as any action or inaction that jeopardizes the maintenance of the coverage under the Insurance Policies could lead to a loss of value for the Debtors' estates.

31. The Debtors believe that the ordinary course maintenance of their necessary insurance coverage, including paying all Insurance Obligations, satisfying all postpetition commitments to the Insurance Carriers, renewing the Insurance Policies, or entering into new insurance policies or premium financing arrangements, without further order of the Court, is necessary and essential to the Debtors' achievement of their chapter 11 objectives, especially where, as here, the Debtors' failure to take all

actions necessary to honor their obligations to and preserve their relationships with the Insurance Carriers could have disastrous consequences for the Debtors' estates.

32.     The employment of the Insurance Broker is necessary for the ordinary course maintenance of the Insurance Policies in the most efficient, cost-effective manner (and has the additional benefit of positioning the Debtors to obtain the most competitive rates and high quality service from the Insurance Broker in connection with any renewals of the Insurance Policies). Accordingly, to the extent that any amounts accrue on account of the Insurance Brokers' Fees or other amounts owed to the Insurance Broker, the Debtors believe that they should be authorized to pay such amounts as they come due.

**B.     Section 363(b) of the Bankruptcy Code Supports Payment of the Insurance Obligations and the Bonding Obligations**

33.     To the extent that payment of any of the Insurance Obligations and the Bonding Obligations sought to be paid under this Motion would be deemed to constitute a use of property outside the ordinary course of business, a basis for authorizing payment of the amounts associated with such obligations is found under § 363(b). Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to § 363(b) upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re BNP Petrol. Corp.*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (citing *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.")); *see also ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. The business judgment

standard in section 363 is flexible and encourages discretion."). Once the debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

34. The Debtors have routinely paid premiums, taxes, charges, fees, and other obligations in connection with the Insurance Policies, the PFA, and the Surety Bonds, and, thus, view the payments of such obligations as ordinary course payments. To the extent the Court (or any party in interest) believes that the Court's express authorization under § 363(b) is necessary to honor the Insurance Obligations or the Bonding Obligations, however, the Debtors assert that sound business judgment supports the relief requested herein because the failure to pay such obligations could result in the cancellation of the Insurance Policies or the Surety Bonds, the Debtors' inability to obtain renewal of the Insurance Policies or the Surety Bonds on terms that are as competitive as they are now, and the violation of the Operating Guidelines, the various applicable federal and state laws and regulations, various contractual commitments, and the fiduciary duties of the debtors-in-possession. Each of these outcomes would be detrimental to the Debtors, their creditors, and their estates. Accordingly, the Debtors submit that they have satisfied the requisite standard applied to requests under § 363(b) and, to the extent necessary, the Court should authorize the payment of all the Insurance Obligations and the Bonding Obligations on such basis.

C. **Section 105 and the Doctrine of Necessity Support Payment of the Prepetition Insurance Obligations and the Prepetition Bonding Obligations**

35. To the extent any payments are made on account of the Prepetition Insurance Obligations and the Prepetition Bonding Obligations, such payments should be authorized pursuant to § 105(a) of the Bankruptcy

Code and under the "doctrine of necessity." Section 105(a) of the Bankruptcy Code authorizes the Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize the payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity");[6] *see also In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex. 2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors to pay certain prepetition claims because "the court d[id] not wish Debtors' businesses seriously damaged"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000).

36.  For the reasons stated herein, and in light of the risks to the Debtors' operations and the critical need for the Debtors to protect their assets and recoverable value from such risks through, among other things, maintenance of legally-mandated insurance coverage and good relationships with the Insurance Carriers, the Sureties, and the Brokers, as well as maintenance of the Surety Bonds, payment of the prepetition Insurance Obligations and the Prepetition Bonding Obligations is proper and justified

---

[6] The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equitable powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Loqansport, C. & Sw. Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay prereceivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. See id. at 309–14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581–82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

pursuant to § 105(a) as necessary to the Debtors' achievement of their chapter 11 objectives.

D. **Sections 363 and 364 Support the Debtors' Request to Maintain Postpetition Insurance Coverage, Surety Bond Coverage, and the Premium Financing Arrangement and Enter into New Coverage as Needed**

37. The Debtors submit that § 363(c) provides statutory authority for the Debtors' request for authorization to, in their reasonable and sole discretion, satisfy all of the Debtors' postpetition commitments with respect to the Insurance Carriers, the Brokers, and the Sureties; renew the Insurance Policies and PFA; or enter into new insurance policies, premium financing arrangements, surety bonds. In pertinent part, § 363(c)(1) provides that "unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997). The maintenance of the Insurance Policies, PFA, and Surety Bonds, and the honoring of postpetition obligations arising thereunder—including undertaking renewals of the Insurance Policies, and PFA as they expire and entering into new insurance arrangements, PFA's or surety contracts—are each the type of ordinary course transactions contemplated by § 363(c). To the extent, however, that the Court (or any party in interest) believes that any such actions are not properly characterized as transactions in the ordinary course of the Debtors' businesses, the Debtors respectfully request that the Court authorize the Debtors to take such actions pursuant to § 363(b) as a reasonable exercise of their business judgment.

38. The Court may also authorize the Debtors to enter into new premium finance agreements pursuant to § 364(c)(2). Section 364(c)(2) authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate. *See* 11 U.S.C. § 364(c)(2). Under any new premium finance agreement, the counterparty would likely require

Page 15

that the Debtors grant a security interest in the unearned premiums under the policies being financed.

39.  Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *see also In re General Growth Props, Inc.*, 412 B.R. 122, 125–26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that (i) "no comparable credit [was] available on more favorable terms"; (ii) the debtors needed post-petition financing "to preserve [their] assets and continue their operations"; and (iii) the terms and conditions of the applicable financing documents had been negotiated in good faith). The Debtors believe that borrowing to maintain essential insurance coverage is in the best interests of the Debtors' estates, and, as referenced above, premium financing companies would likely require a security interest in the unearned premiums under the policies being financed. Accordingly, the Court should authorize the Debtors to renew the PFA and/or execute new premium finance agreements after the Petition Date under substantially similar terms.

E.   **Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

40.  The Debtors have sufficient funds to pay any amounts related to the Insurance Obligations and Bonding Obligations in the ordinary course of business. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Insurance Obligations and Bonding Obligations, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Accordingly, the Debtors request that the Court authorize and direct all banks

and financial institutions to receive, process, honor, pay, and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or rerequest postpetition, drawn on the bank accounts used by the Debtors to satisfy their obligations in connection with the Insurance Obligations and Bonding Obligations, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that the Insurance Carriers, the Brokers, the Premium Financier, or the Sureties may incur as a result of any bank's failure to honor a prepetition check.

## VI.
## EMERGENCY CONSIDERATION

41. Pursuant to Bankruptcy Local Rule 9013-l(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and the success of the Chapter 11 Cases. As discussed in detail above and in the Anapolsky Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Among other things, certain of the Insurance Carriers or Sureties may seek to terminate the Insurance Policies or Surety Bonds, respectively, which would jeopardize the Debtors' operations and endanger the Debtors' efforts to reorganize and maximize the value of their assets through the Chapter 11 Cases. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 as well as the requirements of Bankruptcy Local Rule 9013-1(i) and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## VII.
## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

42. To the extent that any aspect of the relief sought herein constitutes a use of property under § 363(b), the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors request in this Motion is immediately necessary for the Debtors to continue to operate their businesses and preserve the value of their estates. The Debtors respectfully request that the Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## VIII.
## RESERVATION OF RIGHTS

43. Nothing contained herein is or should be construed as: (i) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim or lien on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute an allowed claim; (v) an assumption or rejection of any executory contract or unexpired lease pursuant to § 365; or (vi) a limitation on the Debtors' rights under § 365 to assume or reject any executory contract with any party subject to the proposed Order once entered. Nothing contained in the Order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## IX.
## NOTICE

44. Notice of this Motion will be given to: (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtors' list of holders of the 30 largest unsecured claims against the Debtors; (iii) counsel to Steller Bancorp., Inc., f/k/a CommunityBank of Texas, Jim Doyle (jdoyle@winstead.com); (iv) counsel to Markel Surety Corporation, Chris Ward (cward@clarkhill.com); (v) counsel to The Hartford, Mike

Pipkin (mpipkin@weinrad.com); (vi) the United States Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the Texas Attorney General; and (ix) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required or needed under the circumstances.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed Order, substantially in the form attached hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: April 14, 2023
Houston, Texas

Respectfully submitted,

REED SMITH LLP

_/s/ Michael P. Cooley_
Michael P. Cooley (SBN 24034388)
Taylre C. Janak (SBN 24122751)
Devan J. Dal Col (SBN 24116244)
2750 N. Harwood Street, Suite 1500
Dallas, Texas 75201
(469) 680-4200
mpcooley@reedsmith.com
tjanak@reedsmith.com
ddalcol@reedsmith.com

***Proposed* Attorneys for the Debtors**

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on April 14, 2023, a true and correct copy of the foregoing document was served via electronic mail (e-mail) or via the Court's Electronic Case Filing (ECF) System upon (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtors' list of holders of the 30 largest unsecured claims against the Debtors; (iii) counsel to Steller Bancorp., Inc., f/k/a as CommunityBank of Texas, Jim Doyle (jdoyle@winstead.com); (iv) counsel to Markel Surety Corporation, Chris Ward (cward@clarkhill.com); (v) counsel to The Hartford, Mike Pipkin (mpipkin@weinrad.com); (vi) the United States Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the Texas Attorney General; (ix) the creditors named on the Debtors' Form 204 "30 Largest Creditors List"; (x) those persons who have formally appeared and requested notice and service in these proceedings; and (xi) all governmental agencies having a regulatory or statutory interest in this case.

*/s/ Michael P. Cooley*
Michael P. Cooley

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Michael P. Cooley*
Michael P. Cooley