**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| P&P Construction Group, LLC, et al., | § Case No. 23-90292 |
| | § |
| Debtors. | § Joint Administration Requested |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER**
**AUTHORIZING PAYMENT OF CERTAIN PREPETITION (I)**
**WAGES, SALARIES, AND OTHER COMPENSATION; (II)**
**REIMBURSABLE EMPLOYEE EXPENSES; (III) EMPLOYEE**
**BENEFITS; AND (IV) RELATED COSTS**

---

**Emergency relief has been requested. Relief is requested not later than April 17, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 17, at 11:00 a.m. (prevailing Central Time). Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields and click "Submit" to complete the appearance.**

---

The above-captioned debtors[1] and debtors in possession (collectively, the "*Debtors*") respectfully state the following in support of this emergency motion (the "*Motion*"):

## I.
## RELIEF REQUESTED

1.     By this Motion, the Debtors request entry of an order (the "*Order*"), substantially in the form attached hereto:

(a)     Authorizing the Debtors, in their discretion, to (i) pay or otherwise honor various prepetition workforce-related obligations (the "*Workforce Obligations*")[2] to or for the benefit of their employees (the "*Employees*" or the "*Workforce*"), for compensation, expense reimbursements, and benefits under all plans, programs, policies, and agreements maintained by, or for the benefit of, or contributed to or entered into by, the Debtors prior to the Petition Date (collectively, and as further described herein, the "*Workforce Programs*"),[3] and (ii) continue the Workforce Programs in the ordinary course of business during the pendency of the Chapter 11 Cases (as defined below) in the manner and to the extent that such Workforce Programs were in

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are P&P Construction Group, LLC (4071), and BRH-Garver Construction, LLC (8315). The Debtors' address is 7600 S. Santa Fe, Building D, Houston, TX 77061.

[2] The Workforce Obligations are comprised of the Workforce Compensation Obligations, the Employee Reimbursement Obligations, and the Employee Benefits Obligations (each as defined and described herein).

[3] The Workforce Programs are comprised of the Workforce Compensation Programs, the Employee Reimbursement Programs, and the Employee Benefits Programs (each as defined and described herein).

effect immediately prior to the filing of the Chapter 11 Cases;[4]

(b)    authorizing, but not requiring, the Debtors to pay any and all local, state, and federal withholding and payroll-related or similar taxes, as applicable, relating to the prepetition Workforce Obligations;

(c)    authorizing, but not requiring, the Debtors to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required by any Workforce-related plan, program or policy, or as required by law; and

## II.
## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this Motion. 28 U.S.C. §§ 157, 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory basis for the relief requested herein are 11 U.S.C. §§ 105(a), 362(d), 363(b), 507(a), 541, 553, 1107(a) and 1108 of title 11 of the United States Code (the "***Bankruptcy Code***"),[5] Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***").

---

[4] By this Motion, the Debtors do not seek to assume or reject any Workforce Program to the extent that such Workforce Program is deemed to be an executory contract within the meaning of section 365 of the Bankruptcy Code. Moreover, the Debtors do not waive their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be authorized by applicable law.

[5] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

### III.
### BACKGROUND

4.       BRH-Garver Construction, LLC ("*Garver*") is a civil contractor headquartered in Houston, Texas, focused on micro-tunneling (or trenchless excavation) and related infrastructure projects to public and private projects as well as related service competencies to other areas of site/civil construction. Garver owns and operates a large fleet of equipment and has an in-house fabrication facility that manufactures tools and equipment for specialty projects.

5.       The Garver Business was historically a profitable one.  In 2021, for example, the audited financials of the business showed that it generated approximately $4 million in net income and more than $6 million in EBITDA on stated revenues of more than $61 million.

6.       In 2022, however, the Debtors sustained significant losses on two projects, one of which was bonded by the Hartford Fire Insurance Company ("*Hartford*"). By February 2023, Hartford had issued "hold funds" letters to the counterparties under certain of the Debtors' job contracts requesting that the respective owners release no further contract balances to the Debtors without Hartford's prior written consent.

7.       Shortly thereafter, the Debtors' other bonding company, Markel Insurance Company ("*Markel*," and collectively with Hartford, the "*Sureties*") issued "hold funds" letters of its own, and the Debtors' prepetition senior secured lender, Stellar Bancorp Inc. ("*Stellar*"), accelerated the Debtors' prepetition secured loans and sent letters to project owners directing them to remit any further progress payments or retainage directly to the Prepetition Lender.  Shortly thereafter, the Prepetition Lender froze the Debtors' bank accounts.

8.       The collective effect of these actions was to deprive the Debtors of access to any cash whatsoever except for some limited amounts that the Sureties funded for the weeks of April 3 and April 10, 2023 for payroll and certain vendor payments. Unable to access any of the funds that would ordinarily be available to fund the Debtors' ordinary operating

expenses, including critical items like payroll and utilities, on April 12, 2023 (the "***Petition Date***"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").[6] The Debtors continue to manage and operate their businesses as a debtors-in-possession pursuant to §§ 1107 and 1108.

9.      A detailed description of the Debtors' business, capital structure, and events leading to these chapter 11 cases is fully set forth in the *Declaration of Jeffrey Anapolsky* (the "***Anapolsky Declaration***") and is incorporated herein by reference.

**IV.**
**BASIS FOR RELIEF**

**A.      The Chapter 11 Case.**

10.      The Debtors' immediate objectives in commencing these chapter 11 cases are to: (i) prevent immediate and irreparable harm to their business; (ii) preserve and protect their operations and assets; and (iii) provide necessary time to formulate and pursue an appropriate plan to satisfy the claims of their creditors.

**B.      The Debtors' Workforce.**

11.      As of April 13, 2023, the Debtors employed 46 salaried and 109 hourly employees, with a total of 155 employees. All personnel are employees of BRH-Garver Construction, LLC (each an "***Employee***") and are based in and around Houston, Texas. In addition, the Debtors utilize independent contractors for welding, surveyor, and other services but none of these independent contractors are eligible for any of the Workforce Programs. None of the Debtors' Employees are subject to a collective bargaining agreement or similar labor agreement. Their skills, knowledge, and understanding with respect to the Debtors' operations, customer relations,

---

[6] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

and infrastructure are essential to maintain the Debtors' businesses as a going concern during this case.

**C.      Workforce Compensation Programs**

12.      The Debtors compensate their Workforce by making various payments and allowances, including, without limitation: (i) making payments on account of Employee payroll and allocating Deductions (as defined below), (ii) providing PTO (as defined below), and (iii) providing various Employee Benefits Programs (as defined below), (collectively, the "***Workforce Compensation Programs***" and, any obligations thereunder, the "***Workforce Compensation Obligations***"). The Workforce Compensation Programs are described in further detail below.

(a)      **Employee Payroll and Payroll Deductions**

(i)      **Employee Payroll**

13.      All Employees are paid weekly on Fridays, one week in arrears. The average payroll for each weekly pay period for all Employees is approximately $300,000.00. In February 2023, the Debtors began using ADP for payroll processing services related to payment of the Employees' wages and salaries. As the Debtors pay their Employees in arrears, at any point in time Employees often have some amount of unpaid wages and other compensation that has accrued but unpaid. The Debtors estimate that, as of the Petition Date, Employees are owed approximately $385,000 in gross wages and salaries. No individual Employee is owed wages or salary compensation in excess of the $15,150 priority cap per each eligible Employee statutory priority cap pursuant to section 507(a)(4) of the Bankruptcy Code.

(i)      **Payroll Deductions**

14.      In the ordinary course of business, ADP calculates and withholds all deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, local, income, Federal Insurance Contributions Act (FICA), employment insurance and other taxes, as well as for court ordered garnishments, savings programs,

repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs (collectively, the "***Deductions***"). As described herein, ADP remits Deductions relating to taxes to applicable taxing authorities and the Debtors remit all other Deductions to applicable third parties. The average amount of aggregate weekly Deductions for the Employees are approximately $19,840. The Debtors estimate that, as of the Petition Date, accrued but unpaid Deductions total approximately $28,020.

> (b)   **PTO**

15.     As part of their overall compensation, Employees are eligible, in certain circumstances, to receive paid time off ("**PTO**"). The amount of PTO to which an Employee is entitled varies based upon the Employee's position. Employees are generally entitled to a total of 80 to 160 hours of PTO per year based on years of service and employee pay class. The Employees may carry over accrued but unused PTO into the following year up to 40 hours and sell back up to 40 hours of unused PTO, but an Employee's balance of PTO cannot exceed 160 hours, as applicable depending on the Employee's position, at any given time. Employees who voluntarily resign or who are terminated receive payment on account of any accrued but unused PTO, less applicable withholdings.

16.     Additionally, as of 2023, the Debtors provide all Employees with 10 paid holidays per calendar year. Employees are further entitled to bereavement leave and leave for jury duty.

17.     The Debtors estimate that, as of the Petition Date, aggregate accrued but unpaid PTO liability for all Employees totals approximately $273,850. This accrued amount, however, does not represent a true "cash" liability for the Debtors, as the Debtors anticipate that Employees will use most of their PTO in the ordinary course of business. Accordingly, unless an eligible Employee has resigned or been terminated, PTO is not calculated for the purposes of the statutory priority cap under section 507(a)(4) of the Bankruptcy Code.

**D.      Employee Reimbursement Program**

18.    In the ordinary course of business, the Debtors directly reimburse eligible members of their Workforce by making payments via check in connection with various miscellaneous business expense reimbursements (the "***Employee Reimbursement Program***" and, any obligations thereunder, the "***Employee Reimbursement Obligations***").

19.    Under the Employee Reimbursement Program, Employees are reimbursed for their work-related expenses via normal payroll check practices by the Debtors promptly after a submitted expense report form, including receipts, has received supervisor approval. Work-related expenses include, for example, business travel expenses, working meals, cell phone costs, parking charges, mileage, professional membership dues and conferences, supplies, and other miscellaneous expenditures.[7]

20.    Because Employees may not always promptly furnish their receipts, it is difficult for the Debtors to determine the exact amount outstanding at any particular time. As of the Petition Date, however, the Debtors estimate that accrued and unpaid Employee Reimbursement Obligations total approximately $24,343.

E.    **Employee Benefit Programs**

21.    In the ordinary course of business, the Debtors offer full-time Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation: (i) medical, prescription drug, dental, and vision coverage, (ii) the opportunity to participate in the HSAs (as defined below), (iii) the opportunity to participate in the 401(k)

---

[7] Certain expenses, such as fuel costs, incurred by Employees are paid directly by the Debtors through the Fuel Credit Cards (as defined and described in the Debtors' Emergency Motion For Entry of an Order (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Administrative Expense Status to Certain Postpetition Intercompany Claims (the "***Cash Management Motion***"). The relief sought herein with respect to the Employee Reimbursement Program relates to out-of-pocket expenses incurred by Employees that are not paid by Fuel Credit Cards (as defined in the Cash Management Motion).

Program (as defined below), (iv) workers' compensation, and (v) Life and AD&D, Short Term and Long Term Disability, Critical Illness, Hospital Indemnity, and Accident Insurance (together (i) – (v), the **"*Employee Benefits Programs*"** and, any obligations thereunder, the "***Employee Benefits Obligations***"). The Employee Benefits Programs are described in further detail below.

(a)     **Medical Benefits, Wellness Program, and Vision and Dental Plans**

(i)     **Medical Benefits**

22.     The Debtors offer Employees and their family members the opportunity to obtain basic medical and prescription drug benefits (the "**Medical Benefits**") by choosing (a) one of two plans through All Savers UnitedHealthcare or (b) the Minimum Essential Coverage plan through Reliance Standard (collectively, the "***Medical Plans***"). The Medical Plans offer varying options with varying premiums, deductibles, copays, and out-of-pocket maximums depending on the selected coverage. The obligations incurred by the Debtors on account of the Medical Benefits fluctuate based on the number of Employees and dependents enrolled in the Medical Plans. Historically, the Debtors have incurred approximately $770,000 on average per year in connection with the Medical Benefits. As of the Petition Date, the Debtors estimate that accrued and unpaid fees on account of the Medical Benefits total approximately $95,386.

23.     In addition, as required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***"), the Debtors provide, and WEX Inc. ("***WEX***") administers, temporary continuation of healthcare benefits at group rates to former Employees after their termination, retirement, or disability leave. The former Employees bear all costs associated with COBRA. While the Debtors do not expect any costs to arise in connection with this benefit, the Debtors pay an administrative fee of approximately $150/month to WEX Inc. for COBRA services. The Debtors request that former Employees and eligible dependents retain the right to coverage in accordance with COBRA requirements.

### (ii)   Vision and Dental Plans

24.   The Debtors provide all Employees with the option to enroll in a vision insurance plan (the "***Vision Plan***") through MetLife and a dental insurance plan (the "***Dental Plan***") also through MetLife. The election of either or both of the Vision Plan and the Dental Plan is independent of the Employee's election with respect to Medical Benefits. The Vision Plan is entirely employee funded, but the Debtors fund $10 per month per Employee for the Dental Plan. On average, for the twelve months prior to the Petition Date, the Debtors remitted monthly premiums to MetLife of approximately (a) $3,625 on account of the Dental Plan and (b) $950 on account of the Vision Plan. As of the Petition Date, the Debtors estimate that approximately $13,628 is due and owing on account of the Vision Plan and the Dental Plan.

### (b)   HSAs

25.   The Debtors offer all Employees participating in a high deductible health plan the opportunity to contribute to health savings accounts ("***HSAs***"). Participating Employees may use HSAs for qualified healthcare-related expenses.

26.   Participating Employees make contributions to HSAs via pre-tax compensation deductions, subject to a $3,850 limit imposed by federal law for 2023. During each weekly payroll, ADP calculates the aggregate amount of HSA deductions for Participating Employees. The Debtors send this aggregate amount to WEX weekly to fund participating Employees HSAs.

27.   In addition, participating Employees' HSAs each receive $23.08 per week in employer-funded contributions by the Debtors.

28.   As of the Petition Date, $2,210 was due to WEX for employee- and employer-funded contributions to HSAs.

### (c)   401(k) Plan

29.   The Debtors sponsor a 401(k) retirement savings plan (the "**401(k) Plan**") for eligible Employees. The 401(k) Plan is administered by

ADP. Under the 401(k) Plan, an eligible Employee may contribute a portion of his or her eligible earnings each year through either pre-tax contributions, Roth contributions, or a combination thereof, subject to limits imposed by federal law. These contributions are remitted to ADP by the Debtors at the time of each payroll and ADP is responsible for maintaining the 401(k) Plan accounts on eligible Employees' behalf. In addition, the 401(k) Plan permits Employees to take loans against their individual 401(k) account, and ADP deducts loan payments from applicable Employees' paychecks. The Debtors pay administrative fees to ADP of $1,720 per month. As of the Petition Date, approximately 77 Employees participate in the 401(k) Plan.

30.     The Debtors contribute 100% of first 3% plus 50% of the next 2% of each participating Employee's eligible compensation to such Employee's 401(k) Plan account, subject to limits imposed by federal law and irrespective of amounts contributed to the 401(k) Plan account by the Employee. Contributions made on behalf of participating Employees during the twelve months prior to the Petition Date to the 401(k) Plan totaled approximately $790,750. As of the Petition Date, the Debtors estimate that approximately $18,897 is owed on account of prepetition contributions related to the 401(k) Plan

(d)     **Workers' Compensation**

31.     The State of Texas requires the Debtors, as a private contractor with government entities, to maintain workers' compensation insurance coverage for Employees' claims arising from or related to their employment with the Debtors. To comply with this legal requirement, the Debtors obtained a workers' compensation insurance policy (the "***Workers' Compensation Insurance Policy***") from Texas Mutual Insurance Company for a monthly cost of approximately $15,000.

32.     It is critical that the Debtors be permitted to continue the Workers' Compensation Insurance Policy to make related payments in the ordinary course of business to comply with the laws of the State of Texas. Failure to provide coverage may expose the Debtors to significant liabilities, including from the violation of applicable state law.

33.     To facilitate the ordinary course handling of workers' compensation claims, the Debtors further request authority, in their sole discretion, to modify the automatic stay of section 362 of the Bankruptcy Code to allow such claims to proceed under the Workers' Compensation Insurance Policy and to allow the Debtors and their insurance providers to negotiate, settle and/or litigate such claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

34.     As of the Petition Date, the Debtors estimate that approximately $22,500 is owed on account of the Workers' Compensation Insurance Policy.

(e)     **Life, Disability and Accident Insurance**

35.     The Debtors provide or offer a number of different types of additional insurance benefits to Employees, including, but not limited to, basic life insurance, supplemental life insurance, basic accidental death and dismemberment ("***AD&D***") insurance, short-term disability, long-term disability, supplemental AD&D insurance, child and spouse life insurance, critical illness, hospital indemnity, and accident insurance ("***Life and AD&D Insurance Benefits***"). All employees who are continuously employed for the prior 30 days are provided Life and AD&D insurance.

36.     The Debtors contribute approximately $109.44 per Employee per year for Life and AD&D Insurance Benefits. The Debtors estimate that approximately $4,498 of Life and AD&D Insurance Benefits remain outstanding as of the Petition Date.

**F.     Honoring of Prepetition Workforce Obligations**

37.     The Debtors request authority to pay or provide, as they become due, all prepetition Workforce Obligations that are described in this Motion. An estimate of the outstanding amounts, as of the Petition Date, that the Debtors expect to pay (or have pre-funded to ADP for ADP to pay) pursuant to this Motion, is summarized in further detail below:

| Workforce Obligation | Approximate Amount Outstanding |
|---|---|
| *Workforce Programs* | |
| Employee Payroll Obligations | $384,075 |
| PTO | $273,850 |
| Employee Reimbursement Program | $24,343 |
| *Employee Benefits Programs* | |
| Medical Benefits | $95,386 |
| Vision and Dental Plan | $13,628 |
| HSAs | $2,210 |
| 401(k) Plan | $18,897 |
| Workers' Compensation | $22,500 |
| Life and AD&D Insurance Benefits | $4,498 |
| **Total** | **$839,387** |

38.     Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their Workforce would be jeopardized if the relief requested herein is not granted. Specifically, if the Debtors fail to honor and pay in the ordinary course of business prepetition Workforce Compensation Obligations, Employee Reimbursement Obligations and Employee Benefits Obligations, the Debtors' Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. This hardship would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, the Debtors have determined that payment of these amounts is vital to preventing losses in the Debtors' Workforce during the pendency of the Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

## G.      Postpetition Continuation of Workforce Programs

39.     The Debtors also request confirmation of their right to continue to honor and perform their obligations with respect to all of the Workforce Programs. The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, minimize attrition, and preserve the continuity and stability of the Debtors' operations. The Debtors believe that the expenses associated with the Workforce Programs are reasonable and

cost-efficient in light of the risks of attrition, loss of morale, loss of productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued. Notwithstanding the foregoing, the Debtors reserve the right to evaluate and modify all Workforce Programs, including, but not limited to, terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of the Chapter 11 Cases.

**V.**
**APPLICABLE AUTHORITY**

**A.    Payment of the Priority Portion of Prepetition Employee Obligations Should be Authorized Under § 507(a)**

40.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, and vacation pay be accorded priority in payment in an amount not to exceed $15,150 for each individual. In chapter 11, priority claims must be paid in full. Accordingly, granting the relief requested with respect to the priority portion of prepetition Employee Obligations will not adversely affect the Debtors' other unsecured creditors.

41.    The Debtors believe that, as of the Petition Date, no Employees are owed wages or salary compensation in excess of the $15,150 statutory priority cap pursuant to section 507(a)(4) of the Bankruptcy Code, and in any event, the Debtors do not seek to pay any such Employee in excess of such cap pursuant to this Motion. The amounts of certain prepetition Employee Obligations, such as Reimbursable Business Expenses, are unknown pending submission of claims and, therefore, the Debtors do not know the exact amount due on account of each Employee for the prepetition period.

**B.    The Proposed Payments Are Appropriate under § 363(b)**

42.    Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. See 11 U.S.C. § 363(b). In order to obtain approval for the use of estate assets

outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that Section 363(b) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business").

43.    Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. . . The business judgment standard in section 363 is flexible and encourages discretion."). To the extent the payment of prepetition wages, expenses and benefits are deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees, and the maintenance of positive employee morale provide a sufficient business justification for such payment. *See id*.

44.    Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. . . The business judgment standard in section 363 is flexible and encourages discretion."). To the extent the payment of prepetition wages, expenses and benefits are deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees, and the maintenance of positive employee morale provide a sufficient business justification for such payment. *See id*. Accordingly, this Court should grant the requested relief under section 363(b) of the Bankruptcy Code.

**C.    Payment of Certain of the Prepetition Employee Obligations is Appropriate under Section 541 of the Bankruptcy Code**

45.    The payment of amounts on account of the Employee contribution component of the 401(k) Plan or payment of garnished wages and other similar deductions will not prejudice the Debtors' estates because such withholdings are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code. *See Begier v. IRS*, 496 U.S. 53, 58-59 (1990); *see also In re Contractor Tech., Ltd.*, 343 B.R. 573, 581 (Bankr. S.D. Tex. 2006) (noting that "the estate does not become the true owner of funds held in trust upon the filing of a bankruptcy case."); *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property that debtor holds in trust – either express or constructive – for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."). Moreover, payments that are critical to the retention and morale of the Debtors' Employees add value to the estates because an unplanned reduction in Employee retention or productivity could have a disruptive effect on these Chapter 11 Cases.

**D.    Payment of Prepetition Employee Obligations is Authorized under §§ 1107 and 1108**

46.    The Debtors, operating their businesses as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

47.    According to the *CoServ* court, there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan

Page 16

satisfaction of a prepetition claim." *See id*. The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id*. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498.

48.      Payment of prepetition Employee Obligations meets each element of the *CoServ* court's standard. First, any failure by the Debtors to pay prepetition Employee Obligations would have a severe negative impact on the morale of the Debtors' Employees at a critical time for the Debtors and their businesses. Moreover, as described above, the Employees likely maintain priority claims against the Debtors on account of many of the prepetition Employee Obligations.

49.      Second, the potential harm and economic disadvantage that would stem from the failure to pay prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid. Absent payment of prepetition Employee Obligations, Employee morale would decrease dramatically, likely leading to the loss of key personnel and other severe business disruptions costing far in excess of the amount of such obligations.

50.      Third, the Debtors have examined other options short of payment of prepetition Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists

no practical or legal alternative to payment of such obligations. Therefore, payment of prepetition Employee Obligations is consistent with the Debtors' fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

**E.      Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity Support Payment of the Prepetition Employee Obligations**

51.      The proposed payments of prepetition Employee Obligations should be authorized pursuant to section 105(a) of the Bankruptcy Code, which authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105. For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, preservation of the Debtors' Employee workforce and its morale and productivity, payment of prepetition Employee Obligations as requested herein is proper in accordance with section 105(a) of the Bankruptcy Code.

52.      Payment of the prepetition Employee Obligations is further supported by the doctrine of necessity. The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.[8]

---

[8] The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equitable powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport C & Sw. Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay prereceivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger. See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious, jeopardy.").

*See In re Equalnet Commc'ns Corp.,* 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (recognizing the "doctrine of necessity" and observing that "[t]he need to pay [prepetition wage claims] in an ordinary course of business time frame is simple common sense," and that "[e]mployees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted."); *see also In re CoServ, L.L.C.*, 273 B.R. at 497 (recognizing the "doctrine of necessity"); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex. 2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code."); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors to pay certain prepetition claims because "The court d[id] not wish Debtors' businesses seriously damaged.").

53.     For the reasons discussed herein, it is evident that payment of prepetition Employee Obligations is necessary for the Debtors to achieve their chapter 11 objectives. In particular, without payment of the prepetition Employee Obligations, the Debtors' businesses and operations will be detrimentally impacted through the reduction in Employee morale and the potential loss of key personnel during a critical time for the Debtors and their businesses. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

**F.      A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate**

54.     Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . ." 11 U.S.C. § 362(a)(1).

55.     Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id*. at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with Workers' Compensation Claims in the appropriate judicial or administrative forum. Staying the Workers' Compensation Claims could have a detrimental effect on the financial well-being and morale of the Employees.

56.     Similarly, under the laws of the states in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.[9] If the Debtors fail to maintain the Workers' Compensation Policy or gain the necessary state authorization to self-insure, the Debtors could be exposed to uncapped liability for subsequent workplace injuries or deaths, endangering the Debtors' financial viability. Payment of all amounts relating to the Workers' Compensation Policy and related programs is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

### G.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers

57.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, proceeds from their proposed debtor-in-possession financing, and cash on hand. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of their prepetition Employee Obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore,

---

[9] *See*, *e.g.*, Tex. Labor Code § 406.003 (2019), 407.062, 406.033.

the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## VI.
## EMERGENCY CONSIDERATION

58.     Pursuant to Bankruptcy Local Rule 9013-l, the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and the success of the Chapter 11 Cases. As discussed in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Among other things, continuity of the Cash Management System is critical to the Debtors' ongoing business operations. To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would jeopardize the Debtors' operations and endanger the Debtors' efforts to reorganize through the Chapter 11 Cases. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 as well as the requirements of Bankruptcy Local Rule 9013-1 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## VII.
## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

59.     To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors request in this Motion is

immediately necessary for the Debtors to continue to operate their businesses and preserve the value of their estates. The Debtors respectfully request that the Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**VIII.**
**RESERVATION OF RIGHTS**

60.     Nothing contained herein is or should be construed as: (i) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim or lien on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute an allowed claim; (v) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (vi) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the proposed Order once entered. Nothing contained in the Order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

**IX.**
**NOTICE**

61.     Notice of this Motion will be given to: (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtors' list of holders of the 20 largest unsecured claims against the Debtors; (iii) counsel to Steller Bancorp., Inc., f/k/a CommunityBank of Texas, Jim Doyle (jdoyle@winstead.com); (iv) counsel to Markel Surety Corporation, Chris Ward (cward@clarkhill.com); (v) counsel to The Hartford, Mike Pipkin (mpipkin@weinrad.com); (vi) the United States Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the Texas Attorney General; and (ix) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. In light of the

nature of the relief requested, the Debtors submit that no other or further notice is required or needed under the circumstances.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed Order, substantially in the form attached hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: April 14, 2023
Dallas, Texas

Respectfully submitted,

REED SMITH LLP

*/s/ Michael P. Cooley*
Michael P. Cooley (SBN 24034388)
Taylre C. Janak (SBN 24122751)
Devan J. Dal Col (SBN 24116244)
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
(469) 680-4200
mpcooley@reedsmith.com
tjanak@reedsmith.com
ddalcol@reedsmith.com

***Proposed* Attorneys for the Debtors**

## **CERTIFICATE OF ACCURACY**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Local Rule 9013-1(i).

                                        */s/ Michael P. Cooley*
                                        Michael P. Cooley

## **CERTIFICATE OF SERVICE**

The undersigned certifies that, on April 14, 2023, a true and correct copy of the foregoing document was served via electronic mail (email) or via the Court's Electronic Case Filing (ECF) System upon (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtors' list of holders of the 30 largest unsecured claims against the Debtors; (iii) counsel to Steller Bancorp., Inc., f/k/a CommunityBank of Texas, Jim Doyle (jdoyle@winstead.com); (iv) counsel to Markel Surety Corporation, Chris Ward (cward@clarkhill.com); (v) counsel to The Hartford, Mike Pipkin (mpipkin@weinrad.com); (vi) the United States Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the Texas Attorney General; (ix) the creditors named on the Debtors' Form 204 "20 Largest Creditors List"; (x) those persons who have formally appeared and requested notice and service in these proceedings; and (xi) all governmental agencies having a regulatory or statutory interest in this case.

                                        */s/ Michael P. Cooley*
                                        Michael P. Cooley