**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| P&P Construction Group, LLC, et al., | § Case No. 23-90292 |
| | § |
| Debtors. | § Jointly Administered |

**DECLARATION OF JEFFREY ANAPOLSKY IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Jeffrey Anapolsky, hereby declare as follows under penalty of perjury:

1.      Since January 18, 2023, I have served as the chief executive officer of each of P&P Construction Group, LLC ("***P&P***") and BRH-Garver Construction, LLC ("***Garver***" and, together with P&P, the "***Debtors***").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "***Petition Date***"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").[1]  The Debtors continue to operate their businesses and manage their properties as debtors in possession under §§ 1107(a) and 1108. The Debtors have also filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

3.      I submit this declaration (this "***First Day Declaration***") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "***First Day Motion***").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations

---

[1] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.
## GENERAL BACKGROUND

**A.     The Debtors' Business and Operations.**

4.     Garver is a civil contractor headquartered in Houston, Texas, focused on micro-tunneling (or trenchless excavation) and related infrastructure projects to public and private projects as well as related service competencies to other areas of site/civil construction.





5.      Garver owns and operates a large fleet of equipment and has an in-house fabrication facility that manufactures tools and equipment for specialty projects.



6.      Garver relies on its relationship network with vendors and subcontractors to deliver complete solutions primarily as prime contractor. Customers rely on Garver for underground installation and repair of water sewer, and drainage pipelines. While open trench excavation is the traditional method for lateral repair or replacement by manually installing pipe into open cut trenches, micro-tunneling is an advanced method for installing pipes beneath highways, railroads, runways, harbors, rivers, urban areas, and environmentally sensitive zones.



7.      As of the Petition Date, Garver is prime contractor on six active jobs.  Two of these jobs are bonded by Hartford Fire Insurance Company ("***Hartford***") as surety, and four are bonded by Markel Insurance Company ("***Markel***" and, with Hartford, the "***Sureties***") as surety.

8. Contracts include specific pay items which are billed monthly based on progress, usually linear foot on tunneling. Typical contracts provide that the customer will withhold 5% of the pay application amount until the project is complete as retainage. The customer then releases 1% of this retainage when the project is substantially complete and another 3% when the project achieves final completion. The remaining 1% is not released until the municipal authority signs off, which can take several months.

9. As of the Petition Date, the Debtors had approximately $3.9 million in retainage receivables and $519,023 in retainage payables (i.e., accounts payable that are held in suspense pending collection of the corresponding receivable).

10. Garver's dedicated workforce of approximately 155 employees is skilled at using its large fleet of owned, specialized equipment in dangerous conditions. Garver has an in-house fabrication facility that manufactures tools and equipment for specialty projects. The Debtors' property includes excavators, boring machines, bulldozers, generators, backhoes, compressors, pumps, heavy trucks, truck trailers, vehicles, and other construction equipment.

11. The business known today as BRH-Garver Construction, LLC was acquired from BRH-Garver Construction, L.P. ("***Garver Oldco***") in a transaction that closed effective as of December 31, 2021 (the "***Acquisition Transaction***"). Garver Oldco, in turn, was founded in 1971 by C. Michael Garver to serve municipalities and government-related agencies, such as regional/county water authorities in the Southern USA. In the Acquisition Transaction, Garver acquired substantially all the assets, including the existing job contracts, of Garver Oldco.

12. Following the consummation of the Acquisition Transaction, Garver, a member managed Delaware limited liability company, was a wholly-owned subsidiary of P&P, also a Delaware limited liability company.

**B.      The Debtors' prepetition capital structure**

*The Prepetition Loans*

13.      As of the Petition Date, the Debtors have outstanding funded debt obligations totaling approximately $16,069,778 in aggregate principal amount, which are summarized as follows:

| Funded Debt | Maturity | Principal Outstanding |
|---|---|---|
| Term Loan | December 31, 2026 | $12,069,778 |
| Revolver | December 31, 2026 | $4,000,000 |
| Total Funded Debt: | | $16,069,778 |

14.      Under the terms of that certain Loan and Security, dated December 31, 2021 (the "***Prepetition Loan Agreement***"), between Garver, as borrower, P&P, as guarantor, and Stellar Bancorp Inc. (as successor by merger to CommunityBank of Texas, N.A., "***Prepetition Lender***"), as lender, Garver entered into a term loan facility (the "***Term Loan***") in the original principal amount of $18,000,000 and a revolving credit facility (the "***Revolver***" and, with the Term Loan, the "***Prepetition Loans***") up to $3,000,000 or such lesser amount determined by the borrowing base provisions under the Prepetition Loan Agreement.

15.      The proceeds of the Term Loan were used primarily to refinance Garver Oldco's existing debt and to pay for a portion of the purchase price for Garver's acquisition of certain assets used in the business of Garver Oldco.   The advances made under the Revolver were used primarily for working capital in connection with Garver's business.

16.      Except as explained herein, the Prepetition Loans are secured by first priority liens on and security interests in substantially all of Garver's assets, including Garver's accounts receivable and equipment.   P&P guaranteed repayment of the Term Loan on the terms set forth in the Guaranty Agreement executed by P&P in favor of Prepetition Lender contemporaneously with the Prepetition Loan Agreement.

17.     As of the Petition Date, the Debtors were in default of their obligations under the Prepetition Loan Agreement.

*The Sureties*

18.     In the ordinary course of business, as required by certain applicable statutes, rules, and regulations, the Debtors provide surety bonds (each, a "***Surety Bond***") to certain third parties to secure the Debtors' payment or performance of certain obligations arising under certain of their construction contracts (each, a "***Bonded Contract***").  At this time, all of the Debtors' active projects are subject to Bonded Contracts for which Surety Bonds have been issued in each instance by either Hartford or Markel. For Surety Bonds issued by Markel, Garver executed general agreements of indemnity, and for Surety Bonds issued by Hartford, Garver Oldco executed general agreements of indemnity (collectively, the "***Indemnity Agreements***").

19.     Based on the information available to the Debtors as of the Petition Date, the Sureties had paid out the following amounts on account of vendor claims submitted in connection with one or more Bonded Contracts.

| Project | | Amount Paid |
|---|---|---|
| ***Markel*** | | |
| Project 439 – Chelford 2 | | $87,126.26 |
| Project 440 – Chelford 3 | | $2,000.00 |
| Project 441 – LSSR | | $386.144.74 |
| Project 442 – Laredo | | $0.00 |
| | **Subtotal** | $475,271.00 |
| ***Hartford*** | | |
| Project 429 – 84" Waterline | | $152,871.76 |
| Project 432 – Park Ten | | $3,587,529.35 |
| Retainage | | $68,876.60 |
| | **Subtotal** | $3,809,277.71 |
| | **Total** | **$4,284,548.71** |

20.     Upon information and belief, each of Hartford and Markel asserts that the proceeds payable to the Debtors under a Bonded Contract (**"Bonded Contract Proceeds"**) (i) are not cash collateral for the Prepetition Loans; (ii) are impressed with a trust in favor of the Sureties for the purpose of satisfying the conditions of Bonded Contracts such that they may not be used for any other purpose until such conditions have been fully satisfied; and (iii) are not property of the Debtors' estates because, through principles of equitable subrogation, such funds belong to the Sureties and may be received, possessed, and/or used to satisfy Debtors' obligations on the Bonded Contracts, the Surety Bonds, and to compensate the Sureties under the Indemnity Agreements until fully satisfied. As such, the Sureties assert that the Debtors' property interests in the Bonded Contract Proceeds do not exist unless and until these obligations are fully satisfied.  Furthermore, the Sureties assert that these interests in the Bonded Contract Proceeds supersede any security interests under the liens securing the Prepetition Loans in favor of Prepetition Lender.

21.     The Debtors dispute the Sureties' contention and assert that any such funds represent property of the Debtors' estates under § 541(a) and that any such trust fund does not survive a bankruptcy filing.  Further, I understand that the Debtors believe that any such funds—to the extent impressed with any such trust or other equitable remedy—are so impressed only to the extent of claims paid on the corresponding Bonded Contract and not for any other Bonded Contract on which the Surety may also have paid claims.

### *Other Obligations*

22.     In addition to the Prepetition Loans and the Surety obligations, the Debtors have secured equipment financing obligations outstanding to each of BankFinancial, National Association ("**BankFinancial**") and Komatsu Financial Limited Partnership ("**Komatsu**").

23.     As of the Petition Date, the outstanding balances owed under these equipment financings were as follows:

| Lender | Equipment Financed | Principal Outstanding |
|---|---|---|
| BankFinancial | TM81 / TM84 | $4,098,000 |
| Komatsu | WL34 / EX48 | $527,000 |

24.    In addition, the Debtors owed approximately $9.4 million in unsecured obligations to various prepetition vendors and suppliers.

## II.
## EVENTS LEADING TO THE CHAPTER 11 FILING

25.    Garver's business was historically a profitable one.  In 2021, for example, the audited financials of the business showed that it generated approximately $4 million in net income and more than $6 million in EBITDA on stated revenues of more than $61 million.

26.    In 2022, however, Garver sustained significant losses on two projects: Project 429 and Project 430.  Under Project 429, Garver contracted with the North Harris County Regional Water Authority ("**NHCRWA**") to install 9,510 linear feet of 84-inch water transmission line.  Under Project 430, Garver served as subcontractor to Five Companies, LLC ("**Five Companies**") under contract with the City of Houston included installing 3,630 linear feet of 108-inch diameter water line with 1,775 feet of open cut construction and 1,855 feet in five tunnels averaging 373 feet in length and 11.5 feet in diameter.  Project 429 is bonded by Hartford; Project 430 is not bonded by Garver, but by Five Companies as general contractor on the project. As of the Petition Date, Project 429 is near completion and the Debtors' involvement in Project 430 has been terminated.

27.    Both projects involved substantially larger diameters outside the Debtors' historical core expertise of 24- to 48-inch diameter tunnels.  In addition, the Debtors encountered multiple Differing Site Conditions (DSC) on each project,[2] including encountering unknown fiber optic cables encased in steel pipe, a collapsed tunnel caused by heavy rainfall, and discovery of a

---

[2] In construction parlance, a "Differing Site Condition" generally refers to an unknown and hidden, concealed, or latent *physical* condition encountered at a site that differs materially from the reasonably anticipated conditions.  It does not generally include intangible conditions, such as the availability and cost of labor, materials, and equipment.

hidden underground waste dump. Notwithstanding change orders issued in connection with both projects, however, Garver sustained significant unexpected work stoppages, billing shortfalls, higher costs, and extended schedules. On balance, these two projects, which were originally forecast to generate approximately $3.5 million in profit for the company, will now generate an approximately $6.5 million *loss* for the Debtors—a swing of approximately $10.0 million.

28.     The impact of these two projects on Garver's operations and liquidity was devastating. In addition, following the December 2021 closing of the Acquisition Transaction, it was discovered that Garver Oldco had overstated accounts receivable and understated accounts payable with the effect that working capital was actually close to $2.0 million *less* than originally believed at the time. By January 2023, the Debtors reported approximately $8.9 million in outstanding payables at least 60 days past due, including approximately $3.6 million over 120 days past due.

29.     On January 18, 2023, therefore, the Debtors engaged me as chief executive officer to assist the Debtors in navigating the temporary liquidity crisis prompted by Projects 429 and 430. Under my guidance, the Debtors underwent an immediate $1.0 million reduction in force and began actively searching for additional sources of near-term liquidity. However, with substantially all of Garver's assets encumbered by liens, additional lending sources were not practicable, and the Debtors' equity investors do not presently have the liquidity to inject additional capital into the business until at least the third quarter of 2023.

30.     Since January 2023, the Debtors have worked aggressively to generate liquidity to pay down Garver's accounts payable balance with a particular focus on paying down the over-90 and over-120 balances to ensure that the affected vendors, suppliers, and subcontractors would continue to provide the goods and services necessary to keep Garver's projects going. Among other things, the Debtors sold their equity interest in Five Companies for approximately $2.1 million and negotiated with Five Companies to accelerate the timing of payment of certain receivables related to Project 430 in the form of directed payment to vendors, suppliers, and subcontractors related to Project 430.

31.     By late February 2023, Garver reported just $4.8 million in outstanding payables over 60 days past due, reflecting a $4.1 million reduction compared to the prior month.  Nevertheless, the Debtors continued to experience constrained liquidity and increasing pressure from the Sureties, who were receiving increasing numbers of submissions of Surety Bond claims from unpaid vendors, suppliers, and subcontractors.

32.     On February 27, 2023, Hartford issued "hold funds" letters to the counterparties (the "***Project Owners***") under certain of Garver's job contracts, including the City of Houston, NHCRWA, and other owners. These "hold funds" letters requested that the Project Owners release no further contract balances to Garver without Hartford's prior written consent. This action had an immediate and disruptive impact on the Debtors' liquidity and cash flow forecasting as some of the Project Owners acceded to Hartford's request and withheld progress payments that would otherwise have been paid.

33.     On March 1, 2023, the Debtors, the Sureties, and the Prepetition Lender therefore engaged in an all-day mediation to explore possible means to stabilize the Debtors' liquidity in a way that would enable them to navigate the temporary liquidity shortfalls until later in the year when the Debtors' models forecasted a return to positive cash flow.  Although the mediation did not result in any grand solution, the Sureties agreed, notwithstanding the outstanding "hold funds" letters, to allow progress payments to be released to the Debtors for use to pay operating expenses (including expenses not necessarily arising from the same project as the progress payment) by submitting proposed disbursements to the Sureties for approval prior to funding.  During this period, the Sureties approved all disbursements proposed by the Debtors.

34.     By late March 2023, however, the Sureties had ceased consenting to the release of progress payments to the Debtors from Bonded Contracts.  At about the same time, on March 27, 2023, the Prepetition Lender accelerated the Prepetition Loans and sent letters to Project Owners directing them to remit any further progress payments or retainage directly to the Prepetition Lender.  Shortly thereafter, the Prepetition Lender froze the Debtors' bank accounts.  About this time, Markel issued its own "hold funds"

letters to the City of Houston and City of Laredo relating to certain of the Debtors' other Bonded Contracts bonded by Markel.

35.     The Debtors have a substantial backlog of additional projects expected to generate significant revenue and liquidity going forward.  In total, approximately $6.0 million in February and March 2023 billings has been trapped by the Sureties' "hold funds" letters, with another approximately $386,687 frozen in the Debtors' bank accounts at Stellar.  The collective effect of these actions by the Prepetition Lender and the Sureties was to deprive the Debtors of access to any cash whatsoever except for some limited amounts that the Sureties funded for the weeks of April 3 and April 10, 2023 for payroll and certain vendor payments.

36.     Unable to gain access to cash to pay any other ongoing operational expenses, including expenses for critical utility services, the Debtors made the decision to seek relief under chapter 11 in order to preserve the ongoing business operations and enterprise value of Garver for the benefit of its employees, creditors, and stakeholders.

**III.**
**EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

37.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions[3] seeking relief intended to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

---

[3] Capitalized terms used but not defined herein have the meanings assigned to them in the corresponding First Day Motion.

A.      **Notice of Designation as Complex Chapter 11 Case**

38.      This case involves two separate Debtor entities, and well over fifty parties in interest in this chapter 11 case, including secured creditors, working capital lenders, equipment lessors, utility providers, suppliers, and vendors.    Accordingly, the Debtors submit that these cases warrant designation as a complex chapter 11 case under the Local Bankruptcy Rules applicable in this district.

B.      **Cash Collateral Motion [Docket No. 23]**

39.      In the *Debtors' Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Certain Adequate Protection in Connection Therewith* (the "**Cash Collateral Motion**"), the Debtors request authority to use Cash Collateral and Bonded Contract Proceeds on a limited basis to operate the Debtors' business, to grant the Prepetition Lender and the Sureties adequate protection of their interest in such funds, and certain other related relief.

40.      I believe that the Debtors have an immediate and ongoing need for the use of the Cash Collateral and Bonded Contract Proceeds as well as the cash generated by the Debtors from the operation of their businesses postpetition.    Among other things, the Debtors have ongoing obligations to pay for employee payroll and benefits, rent, insurance, and other expenses necessary to continue the uninterrupted operation of the Debtors' business. It is essential that the Debtors immediately instill their employees, vendors, suppliers, service providers, and customers with confidence in their ability to transition their business smoothly through the chapter 11 process and to operate normally in that environment.

41.      Without authority to use Cash Collateral and Bonded Contract Proceeds, I believe that the Debtors will promptly cease to operate.    Absent the ability to make payroll, the Debtors cannot send workers out to work, and the various projects will cease to advance toward completion.    Without the ability to buy fuel for generators, the drilling equipment underground will become waterlogged and suffer potentially irretrievable damage.    Without the ability to pay subcontractors, vendors, suppliers, equipment lessors, and all the small business owners whose efforts contribute to a successful job,

those critical counterparties will move on to other jobs and the Debtors' projects will grind to a halt.  In that event, everybody loses: the owners lose time as delays mount in the completion of their projects; the Prepetition Lender loses collateral value as equipment is liquidated and receivables turned over to collection; the Sureties lose as bond claims mount and they find themselves forced to take over highly specialized construction projects, which will inevitably cost more to complete with other resources unfamiliar with the projects; the vendors lose otherwise good paying work; and employees lose their jobs.  Without immediate authority to use Cash Collateral and Bonded Contract Proceeds on an interim basis, the Debtors and everyone else in these cases will suffer immediate and irreparable harm.

42.    I believe that the Budget filed with the Cash Collateral Motion demonstrates that the Debtors can operate within fixed budgeted amounts while still generating cash flow and providing adequate protection for any interest the Prepetition Lender and Sureties is ultimately determined to have in the Cash Collateral and Bonded Contract Proceeds.  The Debtors request authority to use Cash Collateral and Bonded Contract Proceeds for the purposes listed in the Budget and in the amounts budgeted.

43.    I believe that the ability of the Debtors to sustain their operations and emerge from chapter 11 is dependent upon obtaining the ability to use Cash Collateral and Bonded Contract Proceeds immediately and, absent the relief sought in the Interim Order, I believe that the Debtors and their estates will be immediately and irreparably harmed.

44.    For the reasons above and in the Cash Collateral Motion, I believe the Court should grant the relief requested in the Cash Collateral Motion.

C.    **Cash Management Motion [Docket No. 15]**

45.    In the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (ii) Authorizing Continuation of Existing Deposit Practices, (iii) Approving the Continuation of Intercompany Transactions, and (iv) Granting Administrative Expense Status to Certain Postpetition*

*Intercompany Claims* (the "***Cash Management Motion***"), the Debtors request certain relief relating to the maintenance of existing bank accounts and deposit practices, the maintenance of their existing corporate credit card programs, and certain other related relief.

### The Debtors' Cash Management System and Bank Accounts

46.     The Debtors' primary source of cash is revenues generated from the construction of pipelines for water, sewage, and drainage systems for public municipalities and other customers.   The Debtors oversee the collection, disbursement, and movement of cash from these operations through a cash management system (the "***Cash Management System***") primarily comprising three bank accounts (the "***Bank Accounts***") maintained by the Prepetition Lender and three bank accounts maintained at JPMorgan Chase Bank, N.A. ("***Chase***", and collectively with the Prepetition Lender, the "***Banks***").   These Bank Accounts are identified and described with greater particularity in the Cash Management Motion.   I understand that, as of the Petition Date, the approximate balances of the Bank Accounts were as follows:

| | |
|---|---:|
| **General Operating Account**<br>*SB-4038* | $381,562.97 |
| **Payroll Account**<br>*SB-4011* | $5,123.76 |
| **Laredo Account**<br>*SB-3037* | $0.00 |
| **Old Operating Account**<br>*Chase-0966* | $96,919.27 |
| **Old Payroll Account**<br>*Chase-1235* | $8,127.39 |
| **Savings Account**<br>*Chase-5071* | $4,784.83 |

47.     In addition, the Debtors recently closed one bank account at Stellar which was opened on March 8, 2023.   The now-closed Stellar bank account was opened following a day-long mediation involving the Debtors, Stellar, Hartford and Markel.   The bank account was originally intended as a holding account for proceeds received from certain bonded contracts on and after that date.   Under an informal agreement reached at the conclusion of

that mediation, such proceeds were to be disbursed by the Debtors to pay for operating expenses only upon approval by the Sureties.  In light of the protections and restrictions that the Bankruptcy Code imposes on the use of Cash Collateral, the Debtors closed the bank account on March 28, 2023.

48.     The Debtors' Cash Management System is critical to the Debtors' operations as it enables the Debtors to, among other things, (i) monitor cash receipts and ensure timely receipt of payment of necessary disbursements, and (ii) ensure accurate cash forecasting and reporting.

49.     *Cash Collections*.  As noted above, the Debtors' revenues (and their expected future revenues) are primarily generated through their micro-tunneling services to public and private projects.  Cash from these activities in the form of progress payments and retainage enters the Cash Management System and is deposited into the General Operating Account where the funds are held pending disbursement for operating and other expenses.  All cash flows through the Debtors' General Operating Account.

50.     *Cash Disbursements*.   The Debtors' disbursements are generally made from the General Operating Account.  Additionally, certain funds are transferred on a weekly basis to the Payroll Account and immediately transferred to the Debtors payroll provider to fund the Debtors' current payroll obligations.  The Payroll Account is a pass-through account used solely to fund weekly payroll.

51.     *Bank Fees*.  The Debtors pay fees and expenses to the Bank related to the costs of administering the Bank Accounts (the "***Bank Fees***") on a monthly basis. The Bank Fees total approximately $650.00 per month. The Debtors estimate that approximately $325 in prepetition Bank Fees have accrued and are unpaid as of the Petition Date.  The Debtors seek authority to pay all prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historical practices.

52.     Business Forms.  As part of their Cash Management System, the Debtors use various preprinted business forms (the "***Business Forms***") in the ordinary course.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request

that the Bankruptcy Court authorize the Debtors' continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.  Once the Debtors have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labeled "Debtor In Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

53.    Corporate Credit Cards.  As part of the Cash Management System, the Debtors provide certain field employees (and a small number of office employees) with access to corporate credit cards (the "***Corporate Credit Cards***") maintained through The Home Depot, WEX® Inc., and First National Bank of Omaha to be used for certain limited business expenses on behalf of the Debtors (the "***Corporate Credit Card Program***"). Such limited business expenses typically include fuel, oil changes, and certain vehicle maintenance costs, as well as other limited general business related expenses incurred while working on certain projects. The Debtors pay the balances that accrue under the Corporate Credit Cards directly to the credit card companies on a monthly basis. The Debtors are solely liable for the amounts charged on the Corporate Credit Cards, with no recourse to the individual employees. The continued use of the Corporate Credit Cards is critical to the Debtors' business operations insofar as it is one of the primary mechanisms by which employee expenses incurred in the ordinary course of employment are efficiently paid.

54.    On average, for the twelve months prior to the Petition Date, the Debtors' employees incurred approximately $177,000 per month in the aggregate on account of business expenses charged to the Corporate Credit Cards. I understand that the Debtors believe that, as of the Petition Date, approximately $230,234.47 is outstanding on account of prepetition business expenses charged to the Corporate Credit Cards.

55.     For the reasons above and in the Cash Management Motion, I believe the Court should grant the relief requested in the Cash Management Motion.

**D.     Utility Motion [Docket No. 18]**

56.     In the *Debtor's Debtors' Emergency Motion for Entry of an Order (i) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit as Adequate Assurance of Payment, and (iii) Establishing Procedures For Resolving Requests by Utility Companies for Additional Assurance Of Payment* (the "**Utility Motion**"), the Debtors request certain relief relating to procedures for providing adequate assurance of payment to certain Utility Companies (as defined in the Utility Motion) and certain other related relief as described in the motion.

### *The Debtors' Utility Companies*

57.     As of the Petition Date, various Utility Companies provide Utility Services to the Debtors at various locations.[4] The Utility Companies service the Debtors' corporate offices and operations and their micro-tunneling operations.  On average, in the twelve months prior to the Petition Date, the Debtors incurred expenses totaling approximately $24,080 per month for utility costs and such utility costs were generally timely paid. Based on the timing of the filings of these chapter 11 cases in relation to the Utility Companies' billing cycles, however, there may be outstanding invoices reflecting prepetition utility costs that have been incurred by the Debtors but for which payment is not yet due, as well as prepetition utility costs for services provided to the Debtors since the end of the last billing cycle that have not yet been invoiced.

58.     The success and smooth operation of the Debtors' businesses depend on the reliable delivery of electricity, internet, waste removal, and telecommunications services.  Uninterrupted Utility Services are, therefore, essential to the Debtors' ongoing operations and, accordingly, the success of

---

[4] The Debtors obtain certain utility services (such as water and waste removal) pursuant to their property leases. The providers of such services are paid by the Debtors' landlords and thus are not included as "Utility Companies" in the Motion.

the Chapter 11 Cases. Indeed, if the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to temporarily cease operations, which would negatively impact recoveries for creditors of the Debtors' estates.

59.     In general, the Debtors have established satisfactory payment histories with the Utility Companies and payments have been made on a regular and timely basis. To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to invoices for prepetition Utility Services as of the Petition Date. The Debtors intend to pay postpetition obligations to the Utility Companies in the ordinary course and in a timely fashion. The Debtors have budgeted for the payments and believe that cash on hand and cash generated through operations will be sufficient to satisfy their obligations to the Utility Companies in the ordinary course on a postpetition basis.

### The Adequate Assurance Deposit

60.     The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, I understand that the Debtors propose to deposit $12,040, which is an amount equal to approximately 50% of the estimated monthly cost of the Utility Services, calculated based on the Debtors' average expenses for such Utility Services during the twelve full months preceding the Petition Date (the "***Adequate Assurance Deposit***"), into a segregated, non-interest-bearing account (the "***Adequate Assurance Account***") within twenty days of the Petition Date. The Adequate Assurance Deposit will be maintained in at least such amount during these chapter 11 cases unless otherwise adjusted as provided for in the Utility Motion.

61.     I understand that the Debtors propose that the Adequate Assurance Deposit may be adjusted or reduced by the Debtors to account for any of the following: (i) to the extent that the Adequate Assurance Deposit includes any amount on account of a company that the Debtors subsequently determine is not a "utility" within the meaning of § 366, (ii) an adjustment

or payment made in accordance with the Delinquency Notice Procedures described below, (iii) the termination of a Utility Service by a Debtor regardless of any Additional Adequate Assurance Request (as defined below), (iv) the closure of a utility account with a Utility Company for which funds have been contributed for the Adequate Assurance Deposit, or (v) any other arrangements with respect to adequate assurance of payment reached by a Debtor with individual Utility Companies; provided that, (a) with respect to a company that the Debtors subsequently determine is not a "utility" within the meaning of § 366, the Debtors may adjust and/or amend the balance of the Adequate Assurance Deposit upon fourteen days' advance notice to such company; and (b) with respect to the Debtors' termination of a Utility Service or closure of a utility account with a Utility Company, the Debtors may adjust or amend the balance of the Adequate Assurance Deposit upon reconciliation and payment by the Debtors of such Utility Company's final invoice in accordance with applicable nonbankruptcy law, to the extent that there are no outstanding disputes related to postpetition payments due.

62.    I also understand that the Utility Motion outlines and seeks the Court's approval of certain Additional Adequate Assurance Procedures in the event that any Utility Company requests additional adequate assurance of payment.  I believe that the Additional Adequate Assurance Procedures are necessary and appropriate to implement an orderly process to determine any challenges to the adequacy of the Debtors' adequate assurance of payment to the Utility Companies.

63.    For the reasons above and in the Utility Motion, I believe the Court should grant the relief requested in the Utility Motion.

**E.    Employee Wages and Benefits Motion [Docket No. 17]**

64.    In the *Debtor's Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition (i) Wages, Salaries, and Other Compensation; (ii) Reimbursable Employee Expenses; (iii) Employee Benefits; and (iv) Related Costs* (the "***Wages and Benefits Motion***"), the Debtors request certain relief relating to the payment of certain prepetition amounts owed to employees for wages and related benefits, the maintenance

of certain employee benefit programs, and certain other related relief as described in the motion.

### *The Debtors' Workforce.*

65.     As of April 13, 2023, the Debtors employed 46 salaried and 109 hourly employees, with a total of 155 employees. All personnel are employees of BRH-Garver Construction, LLC (each an "***Employee***") and are based in and around Houston, Texas. In addition, the Debtors utilize independent contractors for welding, surveyor, and other services but none of these independent contractors are eligible for any of the Workforce Programs. None of the Debtors' Employees are subject to a collective bargaining agreement or similar labor agreement. Their skills, knowledge, and understanding with respect to the Debtors' operations, customer relations, and infrastructure are essential to maintain the Debtors' businesses as a going concern during this case.

### *Workforce Compensation Programs*

66.     The Debtors compensate their Workforce by making various payments and allowances, including, without limitation: (i) making payments on account of Employee payroll and allocating Deductions (as defined below), (ii) providing PTO (as defined below), and (iii) providing various Employee Benefits Programs (as defined below), (collectively, the "***Workforce Compensation Programs***" and, any obligations thereunder, the "***Workforce Compensation Obligations***"). The Workforce Compensation Programs are described in further detail below.

67.     <u>Employee Payroll and Payroll Deductions</u>.  All Employees are paid weekly on Fridays, one week in arrears. The average payroll for each weekly pay period for all Employees is approximately $300,000.00. In February 2023, the Debtors began using ADP for payroll processing services related to payment of the Employees' wages and salaries. As the Debtors pay their Employees in arrears, at any point in time Employees often have some amount of unpaid wages and other compensation that has accrued but unpaid. The Debtors estimate that, as of the Petition Date, Employees are owed approximately $385,000 in gross wages and salaries. No individual Employee is owed wages or salary compensation in excess of the $15,150

priority cap per each eligible Employee statutory priority cap pursuant to section 507(a)(4) of the Bankruptcy Code.

68.     In the ordinary course of business, ADP calculates and withholds all deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, local, income, Federal Insurance Contributions Act (FICA), employment insurance and other taxes, as well as for court ordered garnishments, savings programs, repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs (collectively, the "***Deductions***"). As described in the Wages and Benefits Motion, ADP remits Deductions relating to taxes to applicable taxing authorities and the Debtors remit all other Deductions to applicable third parties. The average amount of aggregate weekly Deductions for the Employees are approximately $19,840. The Debtors estimate that, as of the Petition Date, accrued but unpaid Deductions total approximately $28,020.

69.     PTO.  As part of their overall compensation, Employees are eligible, in certain circumstances, to receive paid time off ("**PTO**"). The amount of PTO to which an Employee is entitled varies based upon the Employee's position. Employees are generally entitled to a total of 80 to 160 hours of PTO per year based on years of service and employee pay class. The Employees may carry over accrued but unused PTO into the following year up to 40 hours and sell back up to 40 hours of unused PTO, but an Employee's balance of PTO cannot exceed 160 hours, as applicable depending on the Employee's position, at any given time. Employees who voluntarily resign or who are terminated receive payment on account of any accrued but unused PTO, less applicable withholdings.

70.     Additionally, as of 2023, the Debtors provide all Employees with 10 paid holidays per calendar year. Employees are further entitled to bereavement leave and leave for jury duty.

71.     The Debtors estimate that, as of the Petition Date, aggregate accrued but unpaid PTO liability for all Employees totals approximately $273,850. This accrued amount, however, does not represent a true "cash" liability for the Debtors, as the Debtors anticipate that Employees will use

most of their PTO in the ordinary course of business. Accordingly, unless an eligible Employee has resigned or been terminated, PTO is not calculated for the purposes of the statutory priority cap under section 507(a)(4) of the Bankruptcy Code.

72.     Employee Reimbursement Program.  In the ordinary course of business, the Debtors directly reimburse eligible members of their Workforce by making payments via check in connection with various miscellaneous business expense reimbursements (the "***Employee Reimbursement Program***" and, any obligations thereunder, the "***Employee Reimbursement Obligations***").

73.     Under the Employee Reimbursement Program, Employees are reimbursed for their work-related expenses via normal payroll check practices by the Debtors promptly after a submitted expense report form, including receipts, has received supervisor approval. Work-related expenses include, for example, business travel expenses, working meals, cell phone costs, parking charges, mileage, professional membership dues and conferences, supplies, and other miscellaneous expenditures.[5]

74.     Because Employees may not always promptly furnish their receipts, it is difficult for the Debtors to determine the exact amount outstanding at any particular time. As of the Petition Date, however, the Debtors estimate that accrued and unpaid Employee Reimbursement Obligations total approximately $24,343.

75.     Employee Benefit Programs.  In the ordinary course of business, the Debtors offer full-time Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation: (i) medical, prescription drug, dental, and vision coverage, (ii) the opportunity to participate in the HSAs (as defined below), (iii) the opportunity to participate in the 401(k) Program (as defined below), (iv)

---

[5] Certain expenses, such as fuel costs, incurred by Employees are paid directly by the Debtors through the Fuel Credit Cards (as defined and described in the Debtors' Cash Management Motion. The relief sought in the Wages and Benefits Motion with respect to the Employee Reimbursement Program relates to out-of-pocket expenses incurred by Employees that are not paid by Fuel Credit Cards (as defined in the Cash Management Motion).

workers' compensation, and (v) Life and AD&D, Short Term and Long Term Disability, Critical Illness, Hospital Indemnity, and Accident Insurance (together (i) – (v), the ***"Employee Benefits Programs"*** and, any obligations thereunder, the "***Employee Benefits Obligations***"). The Employee Benefits Programs are described in further detail below.

76.     <u>Medical Benefits, Wellness Program, and Vision and Dental</u>. The Debtors offer Employees and their family members the opportunity to obtain basic medical and prescription drug benefits (the "**Medical Benefits**") by choosing (a) one of two plans through All Savers UnitedHealthcare or (b) the Minimum Essential Coverage plan through Reliance Standard (collectively, the "***Medical Plans***"). The Medical Plans offer varying options with varying premiums, deductibles, copays, and out-of-pocket maximums depending on the selected coverage. The obligations incurred by the Debtors on account of the Medical Benefits fluctuate based on the number of Employees and dependents enrolled in the Medical Plans. Historically, the Debtors have incurred approximately $770,000 on average per year in connection with the Medical Benefits. As of the Petition Date, the Debtors estimate that accrued and unpaid fees on account of the Medical Benefits total approximately $95,386.

77.     In addition, as required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***"), the Debtors provide, and WEX Inc. ("***WEX***") administers, temporary continuation of healthcare benefits at group rates to former Employees after their termination, retirement, or disability leave. The former Employees bear all costs associated with COBRA. While the Debtors do not expect any costs to arise in connection with this benefit, the Debtors pay an administrative fee of approximately $150/month to WEX Inc. for COBRA services. The Debtors request that former Employees and eligible dependents retain the right to coverage in accordance with COBRA requirements.

78.     The Debtors provide all Employees with the option to enroll in a vision insurance plan (the "***Vision Plan***") through MetLife and a dental insurance plan (the "***Dental Plan***") also through MetLife. The election of either or both of the Vision Plan and the Dental Plan is independent of the Employee's election with respect to Medical Benefits. The Vision Plan is

entirely employee funded, but the Debtors fund $10 per month per Employee for the Dental Plan. On average, for the twelve months prior to the Petition Date, the Debtors remitted monthly premiums to MetLife of approximately (a) $3,625 on account of the Dental Plan and (b) $950 on account of the Vision Plan. As of the Petition Date, the Debtors estimate that approximately $13,628 is due and owing on account of the Vision Plan and the Dental Plan.

79.     HSAs.  The Debtors offer all Employees participating in a high deductible health plan the opportunity to contribute to health savings accounts ("***HSAs***"). Participating Employees may use HSAs for qualified healthcare-related expenses.

80.     Participating Employees make contributions to HSAs via pre-tax compensation deductions, subject to a $3,850 limit imposed by federal law for 2023. During each weekly payroll, ADP calculates the aggregate amount of HSA deductions for Participating Employees. The Debtors send this aggregate amount to WEX weekly to fund participating Employees HSAs.

81.     In addition, participating Employees' HSAs each receive $23.08 per week in employer-funded contributions by the Debtors.

82.     As of the Petition Date, $2,210 was due to WEX for employee- and employer-funded contributions to HSAs.

83.     401(k) Plan.  The Debtors sponsor a 401(k) retirement savings plan (the "**401(k) Plan**") for eligible Employees. The 401(k) Plan is administered by ADP. Under the 401(k) Plan, an eligible Employee may contribute a portion of his or her eligible earnings each year through either pre-tax contributions, Roth contributions, or a combination thereof, subject to limits imposed by federal law. These contributions are remitted to ADP by the Debtors at the time of each payroll and ADP is responsible for maintaining the 401(k) Plan accounts on eligible Employees' behalf. In addition, the 401(k) Plan permits Employees to take loans against their individual 401(k) account, and ADP deducts loan payments from applicable Employees' paychecks. The Debtors pay administrative fees to ADP of

$1,720 per month. As of the Petition Date, approximately 77 Employees participate in the 401(k) Plan.

84.      The Debtors contribute 100% of first 3% plus 50% of the next 2% of each participating Employee's eligible compensation to such Employee's 401(k) Plan account, subject to limits imposed by federal law and irrespective of amounts contributed to the 401(k) Plan account by the Employee. Contributions made on behalf of participating Employees during the twelve months prior to the Petition Date to the 401(k) Plan totaled approximately $790,750. As of the Petition Date, the Debtors estimate that approximately $18,897 is owed on account of prepetition contributions related to the 401(k) Plan

85.      <u>Workers' Compensation</u>.   The State of Texas requires the Debtors, as a private contractor with government entities, to maintain workers' compensation insurance coverage for Employees' claims arising from or related to their employment with the Debtors. To comply with this legal requirement, the Debtors obtained a workers' compensation insurance policy (the "***Workers' Compensation Insurance Policy***") from Texas Mutual Insurance Company for a monthly cost of approximately $15,000.

86.      It is critical that the Debtors be permitted to continue the Workers' Compensation Insurance Policy to make related payments in the ordinary course of business to comply with the laws of the State of Texas. Failure to provide coverage may expose the Debtors to significant liabilities, including from the violation of applicable state law.

87.      To facilitate the ordinary course handling of workers' compensation claims, the Debtors further request authority, in their sole discretion, to modify the automatic stay of section 362 of the Bankruptcy Code to allow such claims to proceed under the Workers' Compensation Insurance Policy and to allow the Debtors and their insurance providers to negotiate, settle and/or litigate such claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

88.     As of the Petition Date, the Debtors estimate that approximately $22,500 is owed on account of the Workers' Compensation Insurance Policy.

89.     <u>Life, Disability, and Accident Insurance</u>.  The Debtors provide or offer a number of different types of additional insurance benefits to Employees, including, but not limited to, basic life insurance, supplemental life insurance, basic accidental death and dismemberment ("***AD&D***") insurance, short-term disability, long-term disability, supplemental AD&D insurance, child and spouse life insurance, critical illness, hospital indemnity, and accident insurance ("***Life and AD&D Insurance Benefits***"). All employees who are continuously employed for the prior 30 days are provided Life and AD&D insurance.

90.     The Debtors contribute approximately $109.44 per Employee per year for Life and AD&D Insurance Benefits. The Debtors estimate that approximately $4,498 of Life and AD&D Insurance Benefits remain outstanding as of the Petition Date.

91.     <u>Honoring Prepetition Work Force Obligations</u>.  I understand that the Debtors request authority to pay or provide, as they become due, all prepetition Workforce Obligations that are described in the Motion. An estimate of the outstanding amounts, as of the Petition Date, that the Debtors expect to pay (or have pre-funded to ADP for ADP to pay) pursuant to the Motion, is summarized in further detail below:

| Workforce Obligation | Approximate Amount Outstanding |
|---|---|
| *Workforce Programs* | |
| Employee Payroll Obligations | $384,075 |
| PTO | $273,850 |
| Employee Reimbursement Program | $24,343 |
| *Employee Benefits Programs* | |
| Medical Benefits | $95,386 |
| Vision and Dental Plan | $13,628 |
| HSAs | $2,210 |
| 401(k) Plan | $18,897 |

| Workforce Obligation | Approximate Amount Outstanding |
|---|---|
| Workers' Compensation | $22,500 |
| Life and AD&D Insurance Benefits | $4,498 |
| **Total** | **$839,387** |

92.     Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I understand that the Debtors believe that the continuity and competence of their Workforce would be jeopardized if the relief requested in the Wages and Benefits Motion and is not granted. Specifically, if the Debtors fail to honor and pay in the ordinary course of business prepetition Workforce Compensation Obligations, Employee Reimbursement Obligations and Employee Benefits Obligations, the Debtors' Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. This hardship would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, payment of these amounts is vital to preventing losses in the Debtors' Workforce during the pendency of the Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

93.     Postpetition Continuation of Workforce Programs.     The Debtors also request confirmation of their right to continue to honor and perform their obligations with respect to all of the Workforce Programs. The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, minimize attrition, and preserve the continuity and stability of the Debtors' operations. I understand that the Debtors believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the risks of attrition, loss of morale, loss of productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued. Notwithstanding the foregoing, the Debtors reserve the right to evaluate and modify all Workforce Programs, including, but not limited to, terminating any particular plan, program, or

policy, as may be necessary or appropriate during the pendency of the Chapter 11 Cases.

94.     For the reasons above and in the Wages and Benefits Motion, I believe the Court should grant the relief requested in the Wages and Benefits Motion.

**F.     Insurance and Surety Motion [Docket No. 16]**

95.     In   the   *Debtors'   Emergency   Motion   for   Entry of an Order Authorizing Debtors to (i) Pay Their Prepetition Insurance Obligations, (ii) Pay Their Prepetition Bonding Obligations, (iii) Maintain Their Postpetition Insurance Coverage, (iv) Maintain Their Surety Bonds, and (v) Maintain Postpetition Financing of Insurance Premiums* (the "***Insurance/Bonding Motion***"), the Debtors request certain relief relating to the administration and maintenance of existing insurance coverage, the payment of related premiums and broker fees, the maintenance of existing surety programs, the payment of certain fees associated with such programs, and certain other related relief.

96.     Insurance Policies.  In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by one or more third-party insurance carriers (the "***Insurance Carriers***"), which provide coverage for, among other things, directors' and officers' liability, general liability, pollution liability, business automobile liability, workers' compensation liability, excess liability, employment practices and third party liability (collectively, the "***Insurance Policies***")[6]. A detailed list of the Insurance Policies under which the Debtors are currently covered is attached to the Insurance/Bonding Motion as Exhibit A.

97.     I believe the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts. The Insurance Policies provide coverage that is typical in scope and amount for businesses

---

[6] The descriptions of the Insurance Policies set forth in the Motion constitute a summary only.

within the Debtors' industry. The total amount of premiums and payments associated with the corporate Insurance Policies is approximately $884,000, and premiums and payments associated with specific project Insurance Policies is $365,000. The Debtors' directors' and officers' policy expire on January 12, 2024.  The Debtors' contractor's professional and pollution liability policies expire on December 28, 2023.  The Debtors' ERISA fidelity bond expires on January 1, 2026, and the specific project policies have various expiration dates.  All of the Debtors' other Insurance Policies expire on August 17, 2023.

98.    In an effort to manage cash flows most efficiently, the Debtors have financed the approximately $475,700 in premiums for the Debtors' excess commercial liability and equipment floater policies (the "***Financed Policies***") pursuant to a premium financing agreement (the "***PFA***") between the Debtors and First Insurance Funding (the "***Premium Financier***"). Under the PFA, the Debtors made an initial down payment of approximately $71,360 on September 29, 2022 and the remaining premium balance of approximately $404,300 (plus a $8,850 finance charge) is required to be paid in ten (10) monthly payments of $41,300. As of the Petition Date, there is approximately $124,000 outstanding under the PFA (*i.e.*, three (3) monthly payments).

99.    The premiums for the directors' and officers', pollution liability, and ERISA bond policies have all been paid in full.  The premiums for the other Insurance Policies (excluding the financed policies described above) are due and paid monthly with the next payment due April 15, 2023. As of the Petition Date, approximately $224,750 of premiums remain with respect to such Insurance Policies.  The premiums for project specific policies are paid upon confirmation of insurance coverage.  As of the Petition Date, the Debtors owe approximately $26,688 in premiums related to project specific policies.

100.    Additionally, the Debtors owe a $5,000 deductible to its equipment floater insurer related to a rental equipment claim.  The payment of the deductible is required by the insurer prior to releasing the claim amounts.  Additional premiums may come due and owing if any project specific policies need to be extended past current expiration dates.

101.    The Insurance Broker manages the Debtors' relationships with the Insurance Carriers. Among other things, the Insurance Broker assists the Debtors in selecting the appropriate carriers (subject to the Debtors' approval) and represent the Debtors in negotiations with the Insurance Carriers. The Insurance Broker has assisted the Debtors in obtaining the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and have obtained savings for the Debtors in the procurement of such policies.  The Insurance Broker collects Broker Fees for services rendered in addition to or as part of the premiums paid on the Insurance Policies.  As of the Petition Date, the Debtors do not believe they owe any amounts to the Insurance Broker on account of prepetition Broker Fees.  To the extent any such prepetition amounts are determined to remain outstanding, the Debtors seek authority to honor any Broker Fees in full, in cash to ensure uninterrupted coverage under their Insurance Policies.

102.    I believe that maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "***Operating Guidelines***"), the federal laws and regulations applicable to the Debtors' businesses, the state of Texas, and the Debtors' various contractual commitments. Thus, the Debtors submit that they should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies or the financing of the same under the PFA as such obligations come due in the ordinary course of the Debtors' businesses.

103.    I also believe that maintenance of their relationships with the Insurance Carriers, the Insurance Broker, and the Premium Financier is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

104.    <u>Surety Bonds</u>.  In the ordinary course of business, as required by certain applicable statutes, rules, and regulations, the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies (collectively, the "***Surety Bonds***"). The Surety Bonds

generally cover performance, completion, and other miscellaneous items (collectively, the "***Covered Obligations***"). A detailed list of the Surety Bonds that are currently maintained for the benefit of the Debtors is attached to the Insurance/Bonding Motion as <u>Exhibit B</u>.[7] The Surety Bonds provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

105.    The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment of their obligations covered by the surety bond from the beneficiary of the surety to the surety. If the Debtors fail to pay the Covered Obligations, the applicable surety will pay the Debtors' obligations, up to a specified amount. Unlike an insurance policy, if a surety incurs a loss on a surety bond, the surety is generally entitled to recover the full amount of that loss from the Debtors.

106.    As of the Petition Date, the Debtors' outstanding Surety Bonds were issued by two separate Sureties: Hartford and Market.  Hartford has issued 19 surety bonds totaling approximately $121,369,789, and Markel has issued 4 surety bonds totaling approximately $80,385,008.00.

107.    Pursuant to its Surety Bonds with Markel, the Debtors are party to an indemnity agreement (the "***Surety Indemnity Agreement***") with Markel.  Under the Markel Surety Indemnity Agreement, the Debtors have agreed to indemnify Markel from any loss, cost, or expense that the Indemnified Surety may incur on account of the issuance of Surety Bonds by Markel on behalf of the Debtors (the "***Indemnity Obligations***"). The Surety Indemnity Agreement also permits Markel, from time to time, to request collateral as security from the Debtors in connection with the Indemnity Obligations.

108.    In addition, although the predecessor to Garver was party to a Surety Indemnity Agreement between itself, certain enumerated guarantors and Hartford. The Hartford Surety Indemnity Agreement was not expressly

---

[7] The Debtors request authority to honor obligations and renew all their surety bonds, as applicable, notwithstanding any failure of the Debtors to include a particular surety bond on <u>Exhibit B</u> to the Insurance/Bonding Motion.

assumed by Garver when it acquired substantially all of the assets of its predecessor in December 2021.

109.    The Debtors' Surety Broker manages the Debtors' relationships with the Sureties. Among other things, the Surety Broker assists the Debtors in selecting the appropriate Sureties (subject to the Debtors' approval) and represents the Debtors in negotiations with the Sureties. The Surety Broker has assisted the Debtors in obtaining the bonding coverage necessary to operate their businesses in a reasonable and prudent manner and has obtained savings for the Debtors in the procurement of such coverage.

110.    The Debtors' Surety Bond premiums are paid from the proceeds of each project's first mobilization payment.  Typically, the Debtors receive the first mobilization payment from each specific project upon completion of five percent of work.  As of the Petition Date, there is approximately $141,714 due in Prepetition Bonding Obligations.

111.    To continue their business operations, the Debtors must be able to provide financial assurances to state governments, regulatory agencies, and other third parties. This, in turn, requires the Debtors to maintain access to their Surety Bonds, including by paying the Bonding Obligations as they come due, and maintaining required letters of credit, paying for any indemnity obligations that may arise in connection with the Surety Bonds in the ordinary course of business, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the existing Surety Bonds or any additional postpetition surety bonds.

112.    For the reasons above and in the Insurance/Bonding Motion, I believe the Court should grant the relief requested in the Insurance/Bonding Motion.

[*This space left intentionally blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: April 16, 2023
　　　　 Houston, Texas

　　　　　　　　　　　　　　　　　　　　 ___/s/  Jeffrey Anapolsky_____
　　　　　　　　　　　　　　　　　　　　 Jeffrey Anapolsky
　　　　　　　　　　　　　　　　　　　　 Chief Executive Officer

Filed by:

REED SMITH LLP

___/s/ Michael P. Cooley_____
Michael P. Cooley (SBN 24034388)
Taylre C. Janak (SBN 24122751)
Devan J. Dal Col (SBN 24116244)
2750 N. Harwood Street, Suite 1500
Dallas, Texas 75201
(469) 680-4200
mpcooley@reedsmith.com
tjanak@reedsmith.com
ddalcol@reedsmith.com

***Proposed* Attorneys for the Debtors**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on April 16, 2023, a true and correct copy of the foregoing document was served via first class mail or via the Court's Electronic Case Filing (ECF) System upon (i) the Debtor; (ii) the Office of the United States Trustee; (iii) counsel for the Prepetition Lender; (iv) counsel for Hartford; (v) counsel for Markel; (vi) the creditors named on the Debtors' Form 204 "30 Largest Creditors List"; (vii) those persons who have formally appeared and requested notice and service in these proceedings; and (viii) all governmental agencies having a regulatory or statutory interest in this case.

*/s/  Michael P. Cooley*
Michael P. Cooley